In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 12-2000

MAURICE COLEMAN,

*Petitioner-Appellant,*

*v.*

MICHAEL LEMKE, Warden,[*]

*Respondent-Appellee.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 99 C 2635 — **Amy J. St. Eve**, *Judge.*

---

ARGUED SEPTEMBER 16, 2013 — DECIDED JANUARY 8, 2014

---

Before KANNE, ROVNER, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Maurice Coleman's collateral challenge of his 1983 murder and armed robbery convictions is before us a second time. In the first appeal, we reversed

---

[*] We substitute Michael Lemke, the current warden of Stateville Correctional Center, as the Respondent in this action. *See* Fed. R. App. P. 43(c)(2).

the district court's denial of Coleman's habeas petition. *Coleman v. Hardy* (*"Coleman I"*), 628 F.3d 314, 323 (7th Cir. 2010). We concluded that the facts underlying Coleman's petition could potentially demonstrate his actual innocence of the state charges and ordered the district court to conduct an evidentiary hearing on the issue. *Id.* at 322-23 (citing 28 U.S.C. § 2254(e)(2)(B)). On remand, the parties completed discovery and the district court held a two-day evidentiary hearing. After the hearing, the district court examined the entirety of the evidentiary record and concluded that Coleman had not satisfied the actual innocence standard. Because Coleman needed to make this showing in order for the court to excuse his failure to exhaust state remedies and consider his substantive ineffective habeas claim, the court denied his petition.

After reviewing the extensive record from Coleman's pretrial investigation, trial, state collateral review, and federal habeas proceedings, we agree with the district court that Coleman has not demonstrated his actual innocence. Much of the evidence Coleman presented to establish his innocence was unreliable. Even though Coleman did introduce evidence that two eyewitnesses were unable to place him at the scene of the crime, this was not enough to overcome the testimony of two eyewitnesses to the crime who identified Coleman as the perpetrator and another witness who implicated Coleman in the murder. Absent a showing of his actual innocence, we must refrain from reviewing the substance of Coleman's procedurally defaulted habeas claims. We affirm the denial of his habeas petition.

## I. BACKGROUND[1]

### A. Offense, Investigation, and Trial

On the evening of August 2, 1981, a drug dealer named Terrell Jackson ("TJ") was shot to death in his home on Chicago's South Side. TJ's brother, Arlander Adamson, and his stepdaughter, Gwen Thomas, were both in the house at the time of the murder. According to Adamson, two men entered the house, pointed their guns at Adamson, tied his hands behind his back, and gagged him. The gunmen forced Adamson up the stairs to TJ's bedroom. Adamson was thrown to the floor, face down. The gunmen repeatedly asked TJ where he kept his money. When TJ refused to cooperate, the assailants fired multiple bullets into him.

One of the gunmen proceeded into the next room where Thomas was watching television with her week-old baby. Thomas was forced into the other bedroom where she was tied up and placed on the floor next to Adamson and a dying TJ. The gunmen eventually left the house and TJ soon succumbed to his wounds.

Adamson and Thomas did not know the gunmen and were only able to provide general descriptions in their initial statements to police. On the day of the crime, they viewed mug shot photos of possible suspects but did not identify TJ's murderer. When police searched the scene, they found

---

[1] We limit our synopsis to those facts bearing on Coleman's actual innocence claim. For a more extensive factual summary that includes information related to Coleman's ineffective assistance of counsel challenge, we refer the reader to our previous opinion in this case. *Coleman I*, 628 F.3d at 315-318.

an unloaded .22 caliber revolver under TJ's mattress. Ballistics tests later revealed that none of the bullets recovered at the scene came from the gun. According to the initial police report of the incident, the gunmen stole a necklace and ring with the initials "TJ" written in diamonds.

Two weeks after the murder, police interviewed TJ's neighbors, two brothers named David and Tracey Wilkins. David told officers that he saw two men on TJ's back porch on the night of the murder. He stated that the two men repeatedly entered and exited TJ's house during the hour-and-a-half period before the shooting. David saw one of the men run across the street to the laundromat and then return to the house a few minutes later. David's brother Tracey was at that laundromat at the time and told police that he saw a man (matching Adamson's and Thomas's description of one of the killers) walk in and use the phone forty-five minutes before the murder. Tracey saw the same man and another man running down the street after the shooting occurred. Both brothers provided descriptions of the two males that were similar to those given by Adamson and Thomas.

Chicago Police officers also spoke to Roy Wright on two occasions over the course of their investigation. The first interview with Wright occurred the day after TJ's murder on August 3, 1981. At that meeting, Wright told officers that on the day of the murder he was trying to coordinate a drug deal with TJ but the deal never went through. He also stated that he picked up two men (one of whom was Coleman and the other whom he did not know) on the night of the murder and dropped them off in front of TJ's house. Police interviewed Wright a second time on August 18, 1981, at which

time Wright stated that Coleman had tried to sell him TJ's medallion with his initials written in diamonds.

On August 19, 1981 (more than two weeks after the murder), Adamson, Thomas, and David Wilkins each separately viewed a police lineup that included Coleman and six other suspects. Adamson and Thomas both identified Coleman as one of the men who murdered TJ. David Wilkins did not select Coleman or any other suspect as one of the men he saw hanging around TJ's house just before the murder. Police interviewed Coleman that same day. He denied any involvement in TJ's murder and stated that he could not remember exactly where he was or what he was doing at the time of the crime. He believed that he was either at the home of his then-girlfriend or at his own home, alone. Adamson and Thomas later viewed another lineup of suspects and identified Joseph Barnes as the other perpetrator.

Coleman and Barnes were tried together in the Circuit Court of Cook County. Each man had his own separate counsel. Adamson and Thomas were the key witnesses tying Coleman to TJ's murder. Both identified Coleman as one of the perpetrators in open court. Adamson testified that he had a good look at Coleman on the day of the murder—they stood six inches away from each other at one point. But on cross-examination Adamson stated that he looked down and closed his eyes when Barnes put a gun to his head. Thomas also identified Coleman as the person who came into her room and brought her into TJ's bedroom. Coleman called two police officers to impeach Thomas's trial testimony. Although Thomas testified at trial that one of the assailants pulled her necklace off, the officers testified that she did not report this theft on the day of the murder. Coleman also elic-

ited testimony from one of the officers that David Wilkins had seen two men near TJ's house around the time of the murder but had not identified Coleman as one of them.

Both Barnes and Coleman were convicted of murder and armed robbery. After considering whether to impose the death penalty, the trial judge elected to sentence Coleman and Barnes to natural life in prison on their respective murder convictions.

### B. State Postconviction Proceedings

After an unsuccessful direct appeal, Coleman pursued postconviction relief with the help of his co-defendant Barnes. In 1994, Barnes submitted an affidavit stating that Coleman had nothing to do with TJ's murder. Barnes stated that his co-defendant should have been Wright. According to Barnes, he, Wright, and another man, Barnett Hall,[2] purchased drugs from TJ that turned out to be of low quality. Barnes averred that, on the evening of the murder, he and Wright went to TJ's house to get their money back. A confrontation ensued during which TJ pulled out a gun. Barnes and Wright responded by pulling out their guns and shooting TJ multiple times in self-defense.

Coleman also submitted a signed affidavit from Barnes's trial attorney, James L. Rhodes.[3] According to Rhodes's statement, Barnes informed him during the trial that Coleman had nothing to do with the murder. Moreover, Rhodes

---

[2] Hall died shortly after the murder in 1981.

[3] Both Rhodes and Coleman's trial attorney, Geary Kull, currently serve as judges for the Circuit Court of Cook County.

stated that Barnes expressed dismay about Coleman's conviction. Coleman also relied upon an affidavit from a defense investigator who interviewed Adamson in 1994. According to the investigator, Adamson told him that Wright had been to TJ's house a couple of times on the day of the murder. Adamson also reportedly told the investigator that Thomas and Wright had dated at some point.

In 2000, while Coleman's postconviction petition was still pending, Loretta Cade, Coleman's girlfriend at the time of the murder and the mother of his child, submitted a signed statement. Loretta stated that Coleman was with her at the time of the shooting. In 1999, Loretta's mother, Evelynn Cade, signed a statement that she called Loretta and Coleman on the day of the shooting in 1981 at approximately 5:00 or 5:15 p.m. and spoke to Coleman for fifteen minutes.

The Illinois postconviction trial court held a hearing on Coleman's petition in which Barnes testified. Ultimately, the court rejected the petition for postconviction relief and Coleman was unable to overturn the decision on appeal.

### C. Federal Habeas Hearing

Coleman filed a federal habeas petition in 1999. In his petition, Coleman asserts three ineffective assistance of trial counsel claims. Coleman concedes that he procedurally defaulted these claims by neglecting to present them for one complete round of state-court review. *See Bolton v. Akpore*, 730 F.3d 685, 696 (7th Cir. 2013) ("Procedural default generally precludes a federal court from reaching the merits of a habeas claim when the claim was not presented to the state courts and it is clear that the state courts would now find the claim procedurally barred."). Coleman argued that the dis-

trict court could still consider his procedurally defaulted claims because he is actually innocent of the crimes of which he was convicted. *See generally Schlup v. Delo*, 513 U.S. 298, 314-15 (1995). After our decision in *Coleman I*, we remanded the case to the district court in order for the court to conduct an evidentiary hearing on the question of Coleman's innocence. So the district court held a two-day hearing in which it received testimony and other evidence.

Barnes testified at the hearing. For the most part, his testimony was consistent with the story he told in his 1994 affidavit. He testified that Wright, not Coleman, had been involved in TJ's murder. But Barnes's story changed in an important way. He stated that three people—Barnes, Wright, and Barnett Hall—entered TJ's house on the night of the murder. This was inconsistent with his 1994 affidavit in which he swore that two people, he and Wright, entered the house and shot TJ. In the story presented at the hearing, Barnes, Wright, and Hall entered the house, went upstairs to TJ's room, and argued with TJ. Barnes further testified that he and his co-assailants exchanged gunfire with TJ and killed him. Barnes also corroborated the affidavit given by his trial attorney, Rhodes, regarding Barnes's statements to Rhodes during trial. According to Barnes, he told Rhodes at the time of trial that Coleman had nothing to do with the murder and also expressed his disappointment that Coleman had been wrongfully convicted. Barnes also testified that he knew Coleman from the neighborhood but that they were not friends.

Rhodes also testified at the hearing and repeated his account of what Barnes had told him at trial. Rhodes also testified about the pre-trial investigation he conducted with

Coleman's attorney, Geary Kull. Rhodes stated that he and Kull interviewed David and Tracey Wilkins, the two brothers who were TJ's neighbors. According to Rhodes, both men were able to identify Barnes as one of the two men they saw on the day of the murder but neither was able to identify Coleman as one of those men. Kull also testified at the hearing about the interview with the Wilkins brothers. Like Rhodes, Kull stated that neither David nor Tracey Wilkins identified Coleman as one of the individuals they saw on the day of TJ's murder.

Coleman also presented testimony from Loretta Cade. She testified that Coleman was staying with her at her parents' home after her parents left for vacation in July 1981. According to Loretta, she and Coleman never left the house, not even for one moment, for the two weeks that her parents were on vacation. In addition, Loretta's mother, Evelynn, submitted an affidavit to the district court in which she stated that Coleman was with her daughter when she called home at 5:15 p.m. on August 2, 1981.

The district court also heard testimony from Wright. Wright testified that he had known Coleman since elementary school. A year before the murder, Wright introduced Coleman to TJ at TJ's house and soon began brokering drug deals between the two men. Coleman eventually began buying drugs directly from TJ. On the day of the murder, Wright stated that he stopped by TJ's house around noon to try to set up a drug deal but left the house shortly after. Around 3 o'clock that same day, Coleman approached Wright at a gas station and asked Wright to drive him and Barnes to a location near TJ's house. During the drive, Wright testified, Coleman and Barnes exchanged handguns and talked about

"tak[ing] care of some business" later that day. After dropping Barnes and Coleman off, Wright went to TJ's house to ask about the potential drug deal. When TJ demurred, Wright left the house and did not come back the rest of the day.

Wright learned of TJ's murder the next day. He testified that he told police about his visits to TJ's house but did not mention his interaction with Barnes and Coleman because he did not believe it was relevant to the investigation. Two days after he spoke with investigators, Wright encountered Coleman at a local playground. Coleman approached Wright and asked him whether he wanted to buy a medallion with the initials "TJ" inscribed in diamonds. Wright stated that he recognized the medallion as TJ's and realized that Coleman was involved in TJ's murder. When the police interviewed Wright a second time, he told them about Coleman's attempt to sell him the medallion and about his interaction with Coleman and Barnes on the day of the murder.[4]

Wright also testified that he knew Adamson and Thomas and admitted that he was present at TJ's house on the day of the murder. But he denied shooting TJ and having a romantic relationship with Thomas. For her part, Thomas testified at the hearing and also denied having a romantic relationship with Wright.

---

[4] For the most part, Wright's testimony at the evidentiary hearing was consistent with the story he told at a preliminary hearing in Coleman's case on September 3, 1981. The one exception relates to the discussion between Coleman and Barnes about "tak[ing] care of some business" which Wright did not mention during the 1981 hearing.

Coleman took the stand on his own behalf at the hearing. He denied ever visiting TJ's home and denied participating in the murder. Although Coleman said he knew Barnes from the neighborhood, he denied being friends with him or being involved in the drug trade with him. Coleman testified that at the time of the murder he was at Evelynn Cade's house with Loretta Cade house-sitting. On cross-examination, Coleman was asked why he was listed on Barnes's list of visitors during the latter's incarceration in 1980. Coleman explained his appearance on the list was a coincidence—he had driven Barnes's wife (who was a friend of Coleman's sister) to the prison to visit Barnes that day.

After the evidentiary hearing, the district court issued a written opinion denying Coleman's habeas petition on the ground that he had not demonstrated his actual innocence. The district court conducted an exhaustive review of the evidence from the pre-trial investigation, the trial, the state postconviction proceedings, and the habeas evidentiary hearing. Based on the entire record, the court found that Coleman had not established his actual innocence and so was not entitled to consideration of his procedurally defaulted habeas claims. Coleman now appeals.

## II. ANALYSIS

Coleman contends that the district court erred in denying his habeas petition based on its conclusion that he had not demonstrated his actual innocence. "When reviewing the district court's decision on a habeas petition, we review its factual findings for clear error and its legal conclusions de novo." *Newman v. Harrington*, 726 F.3d 921, 927 (7th Cir. 2013).

As a general matter, federal habeas courts are precluded from considering habeas claims that were procedurally defaulted because they were not presented for one complete round of state court review. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). But a petitioner can still obtain review of his defaulted claims by establishing that a fundamental miscarriage of justice would result from denial of his petition because he or she is actually innocent. *See House v. Bell*, 547 U.S. 518, 536-37 (2006). "[T]enable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013) (quoting *Schlup*, 513 U.S. at 329). The new evidence may include "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *House*, 547 U.S. at 537 (quoting *Schlup*, 513 U.S. at 324). The actual innocence standard is a demanding one that "permits review only in the 'extraordinary' case." *House*, 547 U.S. at 538. When deciding the ultimate question of innocence, "the habeas court must consider all the evidence, old and new, incriminating and exculpatory" and then "make a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* We review de novo the district court's conclusion as to whether a reasonable juror would convict in light of the all the evidence. *Gomez v. Jaimet*, 350 F.3d 673, 679 (7th Cir. 2003).

In support of his actual innocence claim, Coleman mostly relies on four categories of new evidence: (1) Barnes's testimony that Coleman was not involved in the murder; (2) testimony from Barnes's attorney, Rhodes, that Barnes

professed Coleman's innocence at the time of trial; (3) statements from Coleman's then-girlfriend, Loretta Cade, and her mother Evelynn that Coleman was with Loretta at the time of the murder; and (4) evidence that TJ's neighbors, the Wilkins brothers, could not identify Coleman as one of the men they saw outside TJ's house on the day of the murder. When viewed in conjunction with the entirety of the record in this case, Coleman argues, no reasonable juror would vote to find him guilty beyond a reasonable doubt.

To determine how a reasonable juror would assess Coleman's first category of exculpatory evidence, testimony from his co-defendant, Barnes, we must account for the district court's serious concerns with Barnes's credibility. Following an opportunity to observe Barnes directly at the evidentiary hearing, the district court found that Barnes "was not a credible witness and his testimony and affidavits are not reliable." We almost never disturb this type of finding by the district court. *See generally United States v. Stewart*, 536 F.3d 714, 720 (7th Cir. 2008) ("[D]eterminations of witness credibility can virtually never be clear error."). Nor do we see reason to do so here. For one thing, Barnes has a history of fabrication. For example, the court noted that he previously presented three conflicting accounts of his involvement in TJ's murder: one at his extradition hearing (Barnes was arrested in Baltimore, Maryland), another at trial, and a third during the 1995 evidentiary hearing on Coleman's state postconviction petition. At his extradition hearing in 1982, Barnes testified that he was in Baltimore on the day of the murder. At his 1983 trial, Barnes instructed his wife to lie to the court and testify that Barnes was at home with her in Chicago at the time of the murder. Then, in 1995, Barnes testified that he did kill TJ but that Wright, not Coleman, did the deed with

him and only in self-defense after TJ began shooting. Barnes's inability to present a consistent account of his whereabouts on the day of the murder provided a sound basis for the district court to discount the newest version of events that Barnes presented at the evidentiary hearing.

The district court's disbelief of Barnes's evidentiary hearing testimony was also supported by the inconsistencies between Barnes's account and the other evidence in the case. At the evidentiary hearing, Barnes testified that he, Wright, and Hall went into TJ's house and then the group shot TJ after he pulled a gun on them. But all other accounts of the incident (from Adamson, Thomas, and the Wilkins brothers) suggest that two men, not three, went into TJ's house that evening. Moreover, Barnes's testimony that TJ pulled a gun has no basis in the physical evidence from the scene. Police found TJ's gun under his mattress, unloaded, and none of the bullets found at the scene matched TJ's gun.

Barnes's obvious motive for blaming Wright gave the district court another appropriate ground upon which to base its credibility determination. At Coleman's postconviction hearing in 1995, Barnes testified that he felt embittered toward Wright for supplying law enforcement with information that culminated in his arrest for TJ's murder. He again expressed his animosity toward Wright at the evidentiary hearing before the district court, stating that he was "angry" with Wright for giving him up. The evidence of Barnes's antagonism toward Wright provides another justification for discounting the reliability of the former's hearing testimony. *See generally United States v. Abel*, 469 U.S. 45, 51 (1984) ("A successful showing of bias on the part of a witness

would have a tendency to make the facts to which he testified less probable in the eyes of the jury.").

In addition to his enmity toward Wright, Barnes's friendship with Coleman supports the district court's second thoughts about Barnes's testimony. At the hearing before the district court, Barnes testified that around the time of the murder he and Coleman were "okay. We was all right, you know. It's like you know a next-door neigh-—a person that live on the block." But on cross-examination, Barnes admitted that in 1980, while he was incarcerated on an unrelated charge, he identified Coleman as one of his friends on his visitor list. When asked about this during Coleman's state postconviction evidentiary hearing, Barnes stated that he placed Coleman on the visitor list as a matter of convenience. According to Barnes, Coleman had driven Barnes's wife (a friend of Coleman's sister) to the prison and so Barnes put Coleman's name on the visitor list so that he would not have to wait outside the prison. After having the opportunity to hear this testimony from Barnes, the postconviction trial court found that Barnes and Coleman were indeed friends and concluded that their friendship provided a strong incentive for Barnes to testify in Coleman's favor. We see no reason to disagree with the Illinois postconviction trial court's finding on this point. *See Woolley v. Rednour*, 702 F.3d 411, 426-27 (7th Cir. 2012) ("State court findings … are presumed correct on federal habeas review, unless the petitioner rebuts those findings with 'clear and convincing evidence.'" (quoting 28 U.S.C. § 2254(e)(1))).

Given the fluctuations in Barnes's account over the years, the discrepancies between the most recent edition and the other evidence in the case, as well as his biases against

Wright and in Coleman's favor, the district court did not clearly err in deciding not to believe Barnes's hearing testimony. Barnes's credibility deficiency renders his testimony unhelpful to Coleman's attempt to show his innocence.

Barnes's credibility issues also affect our assessment of how a jury would view the testimony offered by his trial attorney, Rhodes. Coleman maintains that a reasonable juror would find him innocent based on Rhodes's testimony (in hearings before the state postconviction court and the district court) that Barnes told him privately that "Coleman really didn't have anything to do with it" and that Barnes was dismayed by Coleman's conviction. We see no reason to doubt that Rhodes is truthfully reporting Barnes's statements to him. But the ambiguity of these remarks gives them little exculpatory value in isolation. Barnes's statement could mean, as Coleman argues, that Coleman did not participate in the murder. Or perhaps Barnes was merely stating that Coleman did not have any involvement with the underlying dispute between Barnes and TJ which culminated in the latter's murder. Or maybe Barnes was remarking on Coleman's lack of involvement in the planning of the murder. We cannot be sure because Barnes did not provide Rhodes with an explanation of the meaning of his remarks at the time he made them. So to assess the effect of Rhodes's testimony requires consideration of the credibility of his source. Put another way, the value of Barnes's statement depends on the trustworthiness of the clarification Barnes supplied during collateral proceedings in state and federal court.

Unfortunately for Coleman, Barnes's attempts to clarify the meaning of his statement to Rhodes suffered from significant credibility problems. The various accounts of TJ's mur-

der that Barnes presented were internally inconsistent and conflicted with the physical evidence and other testimony. Barnes's biases in favor of Coleman and against the man who got him arrested, Wright, provided him with powerful incentives to fabricate his account. Moreover, the two courts to observe Barnes testify, the state postconviction trial court and the district court, both found his statements that Coleman was not involved decidedly lacking in credibility. In light of the unreliability surrounding Barnes's subsequent attempts to explain what he meant when he told Rhodes that Coleman had "nothing to do with it," Rhodes's testimony about Barnes's ambiguous pronouncements cannot support Coleman's actual innocence claim.

The statements and testimony given by Coleman's alibi witnesses, Loretta and Evelynn Cade, also suffer from similar credibility issues. Recall that Coleman told police that, at the time of the murder, he was either at home alone or with Loretta Cade, his then-girlfriend. Coleman introduced testimony from Loretta at the evidentiary hearing in order to support his alibi. But after observing Loretta's testimony during the evidentiary hearing, the district court found she lacked credibility based on her demeanor on the stand. *See United States v. Noble*, 246 F.3d 946, 953 (7th Cir. 2001) ("[W]e defer to the district court's determination of witness credibility, which can virtually never be clear error.") (internal quotation marks omitted). We see no clear error in this finding. Apart from her demeanor, the substance of Loretta's testimony supports the district court's assessment. For example, Loretta maintained that she and Coleman never left her parents' home for two weeks in early August 1981. Besides its inherent implausibility, Loretta's testimony contradicts Coleman's own testimony that he left the Cades' house the

day after the murder to spend all day at the park. In addition, as the mother of Coleman's child, Loretta had a probable bias in Coleman's favor. *See generally Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("To demonstrate innocence so convincingly that no reasonable jury could convict, a prisoner must have … powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim."). A reasonable juror likely would not be persuaded by statements provided by Loretta's mother, Evelynn Cade, for the same reason: Evelynn's relationship to Coleman suggests she had a motive to give evidence in Coleman's favor. *Id.* In addition, we find it hard to believe that Evelynn would be able to recall, in a sworn statement made almost twenty years after the murder, the precise time that she spoke to Coleman. Neither woman provides much help to Coleman in his actual innocence challenge.

Coleman's best hope is the evidence provided by TJ's neighbors, David and Tracey Wilkins, who observed individuals outside TJ's house on the day of the murder. Both Wilkins brothers viewed a lineup of individuals including Coleman just a few weeks after the murder (Tracey looked at a photo array while David viewed a photo array and an in-person lineup). Neither brother identified Coleman as one of the individuals seen on the same day as the murder. Nor does the record reveal any reason for the Wilkins brothers to lie for Coleman—by all accounts, they did not know each other. Based on the Wilkins brothers' disinterested state-

ments to police and Coleman's attorney, Coleman argues, we must sustain his actual innocence claim.[5]

But we cannot assess the Wilkins brothers' statements in a vacuum. Rather, to evaluate their impact on a hypothetical jury, we must consider them in tandem with the testimony of other witnesses to TJ's murder and any other evidence linking Coleman to the crime. *See House*, 547 U.S. at 538 ("[T]he habeas court must consider all the evidence, old and new, incriminating and exculpatory" and "make a probabilistic determination about what reasonable, properly instructed jurors would do."). Using this approach, we must remember that the Wilkins brothers were not the only witnesses to the murder: Adamson and Thomas both identified Coleman as one of TJ's assailants. Adamson identified Coleman in a live police line-up shortly after the murder, at the preliminary hearing, and at trial. Although Adamson averted his glance from Coleman when a gun was put to his head, he also testified that he stood face-to-face with Coleman, about six inches away from him, when Coleman first entered TJ's home. In total, Adamson spent a few minutes with Coleman over the course of the encounter. Thomas also had an opportunity to view Coleman from up close during the incident (she testi-

---

[5] Coleman has never introduced an affidavit or other sworn statement from either Wilkins brother in support of his claim and did not call them as witnesses at the evidentiary hearing before the district court. Although their statements to police and to Coleman's attorney are relevant to the issue of Coleman's guilt, their sworn statements or testimony would be more powerful evidence in Coleman's favor. *See generally Murillo v. Frank*, 402 F.3d 786, 790 (7th Cir. 2005) ("Live testimony is preferable to affidavits and transcribed confessions, because cross-examination can probe its weaknesses.").

fied he was less than two feet away at one point). Thomas also contemporaneously identified Coleman as one of TJ's murderers in a photo array containing over two hundred mug shots as well as in a live police lineup. These statements possess many of the indicia of reliable eyewitness identifications and constituted the chief evidence of Coleman's guilt at trial.[6] *See generally Manson v. Brathwaite*, 432 U.S. 98, 114 (1977) (listing "opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal … and the time between the crime and the confrontation" as factors to be weighed in determining reliability).

Coleman maintains that evidence adduced at the state and federal collateral proceedings undermines the credibility of Adamson's and Thomas's identifications. Mostly, Coleman relies on a statement from an investigator who assisted Coleman during state postconviction proceedings. According to the investigator, Adamson told him that Thomas and Wright had a "'thing' for a while." This relationship, Coleman argues, supplied both Thomas and Adamson with a motive to implicate Coleman in order to protect Wright. But

---

[6] Coleman argues that a reasonable juror would not find Adamson's and Thomas's identifications particularly strong based on certain aspects of their trial testimony. In support, he cites: (1) Adamson's admission that he looked down from his assailants at one point during the encounter, and (2) the discrepancy between Thomas's testimony that one of her attackers took a necklace from her neck and her failure to report this incident to the police at the time of the crime. But both these matters were elicited on cross-examination during Coleman's trial. The fact that the jury still convicted Coleman despite these complications suggests that they are less significant than Coleman suggests.

Thomas and Wright testified at the evidentiary hearing before the district court that they never had a relationship. In addition, Coleman never established the timing of their purported relationship. Even if Coleman had shown that Thomas and Wright were in a relationship at the time of TJ's murder, it seems far-fetched to argue that Adamson had a motive to protect the man who murdered his brother just because he happened to be dating his brother's step-daughter. Given their reliability and consistency, Adamson's and Thomas's testimony remain convincing evidence of Coleman's guilt.

We must also consider Wright's testimony and other evidence in order to evaluate whether Coleman is actually innocent of TJ's murder. At the evidentiary hearing, Wright testified that, on the day of the murder, he drove Coleman and Barnes to a location near TJ's house and observed that both men had guns on them. He also testified that Coleman tried to sell TJ's medallion to him a couple of days after the murder. Wright's hearing testimony is consistent with a statement in the initial police report noting that the gunmen had stolen a "TJ" medallion from the scene of the crime. Moreover, Wright's testimony is largely consistent with his statement to police (given two weeks after the murder) and with his testimony at Coleman's preliminary hearing a month later. To be sure, Wright's prior convictions and past drug dealing weigh against his credibility. *See generally* Fed. R. Evid. 609. Still, Wright's hearing testimony is entitled to some weight because of its consistency with his statements made contemporaneously with the murder as well as with information gleaned from the scene of the crime.

After reviewing the evidence, both old and new, of Coleman's guilt, we cannot conclude that "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 329. Testimony and statements from Barnes, Rhodes, and the Cades all suffer from profound credibility and reliability problems that most likely would not persuade a reasonable juror of Coleman's innocence. Evidence of the Wilkins brothers' inability to place Coleman at TJ's home on the day of the murder, while helpful to Coleman's cause, is not sufficient to overcome the testimony from Adamson, Thomas, and Wright implicating him in the crime. *See, e.g., Smith v. McKee*, 598 F.3d 374, 387-88 (7th Cir. 2010) (holding that petitioner who "put forth the statements of two witnesses not called at trial" did not "sufficiently counter the state's two eyewitness identifications" and concluding that the actual innocence standard was not satisfied). In short, Coleman's is not "the extraordinary case" of actual innocence that warrants excusal of the procedural default rule. *House*, 547 U.S. at 536. Because Coleman's claims are procedurally defaulted and he has not provided us with a reason to excuse him from application of the rule, we affirm the district court's denial of his habeas petition.

## III. CONCLUSION

The judgment of the district court is AFFIRMED.