In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-1174

CORTEZ JONES,

*Petitioner-Appellee*,

*v.*

VICTOR CALLOWAY,

*Respondent-Appellant*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 08 C 4429 — **James B. Zagel**, *Judge*

ARGUED JANUARY 19, 2016 — DECIDED NOVEMBER 15, 2016

Before EASTERBROOK, ROVNER, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. After a bench trial in Cook County
Circuit Court, Cortez Jones was convicted of murder for the
1999 shooting death of Friday Gardner. In his federal habeas
petition, *see* 28 U.S.C. § 2254, Jones alleged that his trial
counsel was constitutionally ineffective in violation of the
rule of *Strickland v. Washington*, 466 U.S. 668 (1984). The
factual basis for this claim was his attorney's failure to

present the testimony of Michael Stone, a codefendant who was tried separately. Stone confessed to the crime and has consistently maintained that he—and he alone—shot Gardner. Stone's story matched the physical evidence and some (though not all) of the eyewitness testimony. Indeed, a jury convicted Stone of murdering Gardner before Jones's bench trial began, and Stone was willing to testify for Jones had he been asked.

But Jones fumbled his *Strickland* claim in state court by failing to submit an affidavit from Stone, as Illinois law requires. The state appellate court found the claim procedurally defaulted but also rejected it on the merits based on the existing record, holding that the failure to call Stone was a matter of "trial tactics or strategy" and thus immune from constitutional scrutiny.

Ruling on Jones's § 2254 petition, the district court excused the procedural default based on new evidence of Jones's actual innocence—namely, Stone's testimony. After an evidentiary hearing, the judge concluded that the state appellate court unreasonably applied *Strickland* and that trial counsel's failure to present Stone's testimony was constitutionally ineffective representation. The judge accordingly granted the petition and ordered Jones retried or released.

We affirm. The judge's decision to excuse the procedural default was sound, as was his merits ruling. Trial counsel's failure to call Stone cannot reasonably be classified as a mere matter of trial strategy within the range of objectively reasonable professional judgments. Omitting the available testimony of the man who admits to being the lone shooter was both constitutionally deficient performance and prejudicial.

## I. Background

### A. The Murder of Friday Gardner

Around midday on September 12, 1999, three men wearing masks broke into a second-floor apartment at 6102 South May Street on Chicago's south side. Michael Stone shared the apartment with his cousins Latonya Cheeks, Felicia Anderson, and Michella Anderson. Corey Grant, Felicia's fiancé, also lived there. Grant and Michella were home when the break-in occurred, and one of the masked men beat Grant with a baseball bat. The intruders then stole some jewelry, a bag of marijuana, and $200 in cash before fleeing the apartment.

Stone and Felicia Anderson arrived home soon after the assault and robbery. Stone called Michael Carter, his half-brother, and told him what happened. Carter, whose nickname is "Junior," was upset by the news. Driving in his car not far from the May Street apartment, Carter spotted his friend Cortez Jones, the petitioner, and told him about the robbery. Jones hopped into the car with Carter and the two men drove to the May Street apartment.

Carter introduced Jones to the others and the group discussed the identity of the assailants. Suspicion fell on Friday Gardner, a cousin and frequent houseguest of Rena Phillips, who lived in the apartment across the hall. It's not clear who first suggested that Gardner was involved—Carter, Felicia, Michella, or Jones—but everyone assumed the perpetrators came from the neighborhood. And they all knew that Gardner kept a van parked on the street outside the May Street apartment.

Carter and Jones then left the apartment, located Gardner's van, broke into it, and stole the radio. This was apparently an effort to lure Gardner onto the street. Jones denies participating in this theft, but it's undisputed that he and Carter then left the neighborhood together and did not return until around nine or ten o'clock that evening in response to a page from Stone.

At about ten o'clock, Gardner appeared on the street outside the May Street apartment. Carter and Jones approached him and got into an argument so heated that Stone, who was still in the second-floor apartment, heard the commotion from the window. The argument also drew the attention of many neighbors.

Stone kept a .380-caliber pistol in the basement of the apartment building. As the situation on the street intensified, he retrieved the gun and went outside to watch the argument from the alley. Stone maintains that he saw Gardner draw and aim a handgun at Carter and Jones, so he approached from the alley and fired his .380 pistol at Gardner three times. He says he shot Gardner to protect Carter, his half-brother. Two shots hit their mark: Gardner died at the scene with two .380-caliber bullets in his abdomen. Three .380-caliber shell casings were found near the body. No gun was found on Gardner's person, but trial testimony suggested that someone may have removed one from his hand after the shooting.

Stone, Carter, and Jones fled the scene. Carter and Jones were arrested the next day, and Stone turned himself in to Chicago police the following day. Stone immediately confessed to shooting Gardner using his .380-caliber handgun. He said he did it in defense of his half-brother. The

.380 pistol was never recovered; Stone said he threw it in some bushes as he fled the scene.

## B. Trial and State Postconviction Proceedings

All three men were charged with first-degree murder. The charges against Stone and Carter were tried jointly to a jury. The prosecution's theory was that both Stone and Carter fired shots at Gardner. As an alternative theory against Carter, the prosecutor argued that if Stone alone shot Gardner, then Carter was responsible under an accountability theory because he planned the crime with Stone and helped lure Gardner onto the street. Stone testified in his own defense, telling the jury that he shot Gardner with his .380 handgun to prevent him from shooting Carter. The jury found both defendants guilty. They were sentenced to 30 years in prison. *See Carter v. Duncan*, 819 F.3d 931, 935–37 (7th Cir. 2016).

Jones's case was tried separately, and he opted for a bench trial. The prosecution's sole theory at his trial was that *Jones* was the shooter; accountability theory played no part. The prosecution's case rested on testimony from several eyewitnesses, but their accounts diverged in significant respects.

As we've noted, Gardner's cousin Rena Phillips lived in the apartment across the hall from Stone and his cousins. Her son Antonio lived with her, and both Phillipses testified that they saw Jones shoot Gardner at very close range. Antonio said he watched the argument from his apartment window and saw Jones pull out a gun; he said Carter also had a gun. He testified that Jones was so close to Gardner that he had to take a step back in order to extend his arm

and fire the first shot. He estimated that Jones's gun was only about an inch away from Gardner when he pulled the trigger. Antonio testified that after the first shot was fired, he ran down the stairs and heard two more shots as he ran. When he reached the street, he saw Carter and Jones running away from the scene.

Rena Phillips said she and her boyfriend Paul Calmese had just pulled up outside the building when the confrontation started. Tommy Gaston, a friend of Gardner's, was also on the street that night. Rena testified that she saw Jones shoot Gardner twice at close range. She also said Carter had a gun and fired shots at Gardner.

Gaston's version of events was quite different. He said he didn't see a gun in Jones's hand but thought he might have had one in his coat pocket and may have fired a shot through his coat. Gaston's testimony conflicted with the account he gave on the night of the shooting. Back then he told the police that he saw Stone emerge from the alley and shoot Gardner. When questioned about this discrepancy at trial, Gaston denied that he changed his story.

The only eyewitness with no connection to either the victim or the three defendants was Cedric Taylor, a Chicago police officer. Officer Taylor was on duty and standing with his partner in front of a police station about a block west of the shooting. The station was across from the alley where Stone watched the argument unfold and from which he said he emerged and fired three shots at Gardner. Officer Taylor testified that as he glanced toward the alley, he saw muzzle flashes and heard two gunshots, then heard three more shots much louder than the first two. He ran toward the gunfire and saw two men ducking down behind a Cadillac and two

men running away from the scene. One of the fleeing men carried a dark object that Officer Taylor said could have been a handgun. Officer Taylor and his partner gave chase but couldn't catch up with the fleeing men.

The defense eyewitnesses gave still another—and quite different—account. Latonya Cheeks, Stone's cousin and apartment-mate, said she heard Carter and Jones arguing with Gardner and saw Gardner draw a gun. She testified that Stone came running from the alley and shot Gardner; she said she heard three shots. Her trial testimony conflicted with her grand-jury testimony in one respect: In the grand jury, Cheeks said that Gardner was unarmed. Michella Anderson, another Stone cousin and apartment-mate, told the court that she saw someone come from the alley and shoot Gardner and that Jones was not the shooter. She also testified that she saw Gardner with a gun. Neither Stone nor Carter testified.

The physical evidence introduced at trial was limited. Three .380-caliber shell casings were found at the scene near Gardner's body. No fingerprints were recovered from the casings. Gardner died from two gunshot wounds to the abdomen. Two .380-caliber bullets were recovered from his body, and forensic analysis established that the bullets were fired from the same firearm. The forensic and autopsy evidence was inconsistent with a shooting at close range, contradicting the testimony of Rena and Antonio Phillips.

In closing argument Jones's attorney told the court that the physical evidence and eyewitness accounts were too widely divergent to support a finding of guilt beyond a reasonable doubt. Counsel also noted the jury's verdict in the Stone/Carter trial and pointed out that the prosecution

had dramatically changed its theory of the case. The judge found Jones guilty and imposed a sentence of 30 years in prison.

The Illinois Appellate Court affirmed on direct appeal. Jones then pursued state postconviction relief alleging that the failure to call Stone as a defense witness at trial was constitutionally ineffective under *Strickland*. (He raised other arguments as well; none are relevant here.) The postconviction court summarily dismissed the petition because Jones had not included an affidavit from Stone, as Illinois law requires. *See* 725 ILL. COMP. STAT. 5/122-2. The Illinois Appellate Court held that this procedural violation was independently enough to affirm. *People v. Jones*, No. 1-05-1212, at 6 (Ill. App. Ct. Sept. 26, 2006) (unpublished order) (holding that the procedural violation "alone justifies the summary dismissal of defendant's petition").

But the court went on to apply *Strickland* based on the existing record, holding that "counsel's failure to call codefendant Stone as a witness is a matter of trial tactics or strategy, which is purely a matter of professional judgment and cannot support a claim of ineffective representation." *Id.* at 7. The court said that strategic decisions are immune from constitutional scrutiny unless counsel "entirely fails" to subject the prosecution's case to adversarial testing. *Id.* at 7–8. The court also held that the failure to call Stone was not prejudicial for two reasons: (1) It was "highly likely" that Stone would have invoked his Fifth Amendment right not to testify; and (2) "several eyewitnesses" testified that Jones shot the victim, so "the outcome of the trial would not have been different had counsel attempted to present the testimony of codefendant Stone." *Id.* at 8.

The decision was not unanimous. The dissenting judge concluded that Jones had "raised the gist of a meritorious claim of ineffective assistance" that warranted further development on remand. *Id.* at 9 (Wolfson, J., dissenting). The Illinois Supreme Court denied review.

## C. Jones's § 2254 Petition

Jones then moved his case to federal court. His § 2254 petition reprised the *Strickland* claim stemming from his trial counsel's failure to call Stone as a witness. The district judge found the claim procedurally defaulted but held an evidentiary hearing to give Jones an opportunity to satisfy the miscarriage-of-justice exception to procedural default. This required a showing of actual innocence. *See generally Schlup v. Delo*, 513 U.S. 298 (1995).

The judge heard testimony from several witnesses who had not testified at Jones's trial. Felicia Anderson testified that she saw Gardner draw a gun during the argument and thought it was Carter who shot him. She said she ran from the scene screaming, "Junior shot him. Junior shot him." (Recall that Carter's nickname is Junior.) But she admitted that she only heard the gunshots and did not actually see Carter fire a gun. Paul Calmese, Rena Phillips's boyfriend, testified that he saw Stone approach from the alley but also saw Jones pull out a gun, though he did not see him fire it. Carter testified that Stone was the only person to fire a gun and there was no plan to kill Gardner.

Most crucially, Stone testified that he—and he alone— shot Gardner. He explained that as the argument on the street escalated, he retrieved his .380 handgun from the basement and positioned himself in the alley to watch the

confrontation. He said that he saw Gardner pull a gun from his front waistband, so he emerged from the alley and fired his .380 at Gardner three times to prevent him from shooting Carter, his half-brother. Stone confirmed that he turned himself in two days later and confessed in full to the police. He also testified that he and Jones weren't friends, he didn't plan the killing with Carter *or* Jones, and he never saw Jones with a gun that night.

The final important witness was Brian Dosch, Jones's trial attorney. Dosch testified that he decided not to call Stone as a witness at Jones's trial because the police report summarizing his confession wasn't consistent about whether he actually saw Gardner draw a gun before he fired the three shots.

The judge credited Stone's testimony, reviewed it against the entire record, and concluded that it satisfied the actual-innocence gateway to a merits review of the procedurally defaulted *Strickland* claim. Moving to the merits, the judge found Stone's testimony entirely consistent with his prior testimony at his own trial. Stone's testimony was also consistent with the physical evidence and the testimony of some of the eyewitnesses; in contrast, the testimony of the prosecution's eyewitnesses was *inconsistent* with the physical and forensic evidence. The judge could conceive of no justification for omitting Stone's testimony at trial.

Accordingly, proceeding first under the deferential standard of § 2254(d), the judge held that the Illinois Appellate Court unreasonably applied *Strickland* by treating counsel's failure to call Stone as a mere strategic or tactical trial decision and declaring it immune from constitutional scrutiny. Next, reviewing the claim independently under

§ 2254(a), the judge concluded that counsel's performance was both constitutionally deficient and prejudicial. The judge accordingly granted the habeas petition and ordered Illinois to retry its case against Jones or release him from custody.

Illinois asks us to reverse that decision.

## II. Analysis

We review the district court's factual findings in a habeas ruling for clear error; legal conclusions get independent review. *Coleman v. Lemke*, 739 F.3d 342, 349 (7th Cir. 2014).

## A. Procedural Default and Actual Innocence

Section 2254(d) sets a high bar for state prisoners seeking federal habeas review. A federal court may not grant a state prisoner's habeas petition unless the prisoner establishes that the state court's adjudication of his claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." § 2254(d)(1). At issue here is the Sixth Amendment right of the criminal accused to the effective assistance of counsel as interpreted by the Supreme Court in *Strickland*.

To obtain a merits review of his claim, however, Jones had to clear an additional high hurdle: procedural default. As we've explained, the state postconviction court dismissed Jones's *Strickland* claim because he failed to include a supporting affidavit from Stone or explain why an affidavit was unavailable. Illinois law imposes this procedural requirement, *see* 725 ILL. COMP. STAT. 5/122-2, and the Illinois Appellate Court affirmed the lower court's reliance on it. The appellate court noted that Jones was required to, but did not, submit an affidavit from Stone indicating that "he would

have been willing to testify" and "what the substance of that testimony would have been." This procedural violation alone, the court held, justified the summary dismissal of the *Strickland* claim.

Illinois courts regularly enforce the affidavit rule. *See, e.g.*, *Thompkins v. Pfister*, 698 F.3d 976, 987 (7th Cir. 2012); *see also People v. Collins*, 782 N.E.2d 195, 198 (Ill. 2002). So the *Strickland* claim is procedurally defaulted. *See Thomas v. Williams*, 822 F.3d 378, 384 (7th Cir. 2016) (explaining the two forms of procedural default, noncompliance with state procedural rules and failure to exhaust state remedies). And procedural default ordinarily precludes federal habeas review. *Id.*

A state prisoner can overcome a procedural default by establishing cause for the default and actual prejudice or by showing that the federal court's failure to address his claim on the merits would work a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536–37 (2006); *Schlup*, 513 U.S. at 314–15. This case concerns the miscarriage-of-justice path to merits review.

The miscarriage-of-justice exception to procedural default requires the petitioner to make a convincing showing of actual innocence. *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1929 (2013); *Schlup*, 513 U.S. at 314–15. To pass through the actual-innocence gateway to a merits review of a procedurally barred claim, the petitioner must have "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial," *Schlup*, 513 U.S. at 324, and must persuade the district court that it is "more likely than not that no reasonable juror would have convicted him in light of the new evidence," *id.* at 327.

"New evidence" in this context does not mean "newly *discovered* evidence"; it just means evidence that was not presented at trial. *Id.* at 322, 324. And because an actual-innocence claim "involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record." *House*, 547 U.S. at 538. The inquiry considers "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *Id.* (internal citations and quotation marks omitted). The court must "make a probabilistic determination about what reasonable, properly instructed jurors would do." *Schlup*, 513 U.S. at 329.

The actual-innocence standard isn't deferential to the verdict, like the legal standard for evaluating challenges to the sufficiency of the evidence. *Id.* at 330 ("[T]he mere existence of sufficient evidence to convict [is not] determinative … ."); *see also Hayes v. Battaglia*, 403 F.3d 935, 940 (7th Cir. 2005) (Flaum, J., concurring) ("Unlike a review of the sufficiency of the evidence which focuses on whether a rational juror *could* have convicted, a habeas court considering actual innocence … determin[es] whether rational jurors *would* have convicted.").

We have one last important doctrinal point: Procedural actual-innocence claims like this one are evaluated differently than *substantive* claims of actual innocence. *Schlup*, 513 U.S. at 316–17. In a substantive actual-innocence claim, the petitioner's new evidence must be strong enough to convince the court that his sentence is constitutionally intolerable "*even if* his conviction was the product of a fair

trial." *Id.* at 316. In a procedural—or "gateway"—actual-innocence claim, the petitioner's new evidence need only establish sufficient doubt about his guilt to justify a conclusion that his sentence is a miscarriage of justice "*unless* his conviction was the product of a fair trial." *Id.* Put slightly differently, a petitioner satisfies the gateway standard if his new evidence raises "sufficient doubt about [his] guilt to undermine confidence in the result of the trial without the assurance that the trial was untainted by constitutional error." *Id.* at 317.

The district judge credited Stone's testimony and concluded, based on the entire record, that the gateway actual-innocence standard was met. We defer to the judge's credibility determination, *see Coleman*, 739 F.3d at 350, and agree that the new evidence of actual innocence warrants a merits review of Jones's *Strickland* claim.

In brief, the decisive evidentiary points are these: Stone turned himself in two days after the crime and immediately confessed to shooting Gardner. From the beginning he has consistently maintained that he alone shot Gardner and that he did not plan the crime with either Carter or Jones. He says he used his .380 pistol and fired three times. That account matches the physical and forensic evidence; the accounts of the prosecution's eyewitnesses do not. His testimony is also corroborated at least in part by some of the eyewitnesses (e.g., Cheeks, Officer Taylor, and Calmese). And Stone's testimony in the district court was entirely consistent with his testimony at his own trial.

The eyewitness testimony, moreover, was all over the map. No two witnesses gave the same account of the shooting. Antonio and Rena Phillips gave roughly similar descrip-

tions, but their version of events—that Jones shot Gardner at very close range—is directly contradicted by the physical evidence, which showed no signs of a close-range shooting. Gaston, a third prosecution eyewitness, said only that he thought Jones had a gun in his coat pocket and may have fired a shot through his coat. But he told the police on the night of the shooting that he saw Stone emerge from the alley and shoot Gardner, so his testimony is at best a wash. The remaining eyewitnesses at least partially corroborate Stone's testimony.

In short, we agree with the district judge that the new evidence, considered in light of the entire record, raises sufficient doubt about Jones's guilt to undermine confidence in the verdict without the assurance that it was untainted by constitutional error. Stone's testimony, together with the other new evidence presented at the hearing, raises reasonable doubt about Jones's guilt. Had this evidence been presented, we think it's more likely than not that Jones would have been acquitted.

Illinois resists this conclusion by analogizing this case to *Coleman*, but the analogy is superficial at best. In *Coleman*, as here, an Illinois prisoner serving a sentence for murder tried to pass through the actual-innocence gateway to a merits review of his procedurally defaulted *Strickland* claim. 739 F.3d at 347–49. That's where the similarities end. The new evidence in *Coleman* consisted largely of the testimony of the codefendant; the district court rejected the claim because the codefendant had serious credibility problems. *Id.* at 350. We affirmed, noting that the codefendant had demonstrated an "inability to present a consistent account of his whereabouts on the day of the murder," told several ver-

sions of his involvement in the murder, and attested to facts that did not match the physical evidence at the scene. *Id.* The codefendant was also the petitioner's friend, which undercut the credibility of his testimony. *Id.*

This case is not comparable. Here, the district judge explicitly credited Stone's testimony, finding it consistent over 15 years and multiple tellings, and consistent with the physical and forensic evidence. As we remarked in *Coleman*, "[w]e almost never disturb this type of finding by the district court." *Id.* "[D]eterminations of witness credibility can virtually never be clear error." *United States v. Stewart*, 536 F.3d 714, 720 (7th Cir. 2008) (quotation marks omitted).

Illinois also argues that even if the new evidence casts serious doubt on its theory that Jones was the shooter, his actual-innocence claim must be rejected because he is guilty under an accountability theory. This argument is new in federal court; the prosecutor's narrative at trial was that Jones shot Gardner twice at close range. Criminal liability on an accountability theory requires proof of shared criminal intent or participation in a common criminal design. *See People v. Redmond*, 793 N.E.2d 744, 755 (Ill. App. Ct. 2003). To convict Jones of Stone's act would have required evidence that they shared a criminal intent or participated in a common criminal design, and that's lacking here. At most, the evidence places all three codefendants at the scene and suggests that they all suspected Gardner was involved in the robbery and beating at Stone's apartment and were upset about it. But the record does not support Illinois's new theory that Jones and Stone schemed to kill Gardner.

To the contrary, Stone has consistently maintained that he acted alone and there was no plan to kill Gardner. The

judge found his testimony credible, consistent over 15 years of retelling, and corroborated by the physical and forensic evidence and the testimony of at least some of the eyewitnesses. Carter likewise testified that there was no plan to kill Gardner. The judge rejected Illinois's new accountability theory as unconvincing, and we see no reason to disturb that ruling.

## B. *Strickland*, § 2254(d), and § 2254(a)

Moving now to the merits of the *Strickland* claim, our first question is whether Jones has satisfied the demanding requirements of § 2254(d). That requires us to decide whether the Illinois Appellate Court's decision was "contrary to" or "an unreasonable application of" clearly established federal law—here the Sixth Amendment right of the accused to effective counsel as interpreted in *Strickland*. The district judge held that Jones met the requirements of § 2254(d), and again we agree.

The familiar *Strickland* formula requires the petitioner to establish that his attorney's performance was deficient—that is, objectively unreasonable—and the deficient performance was prejudicial. 466 U.S. at 687–88. The first step in this framework asks "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. The prejudice inquiry asks whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

At S*trickland*'s first step, the petitioner will often need to overcome a "strong presumption" that "the challenged action might be considered sound trial strategy." *Id.* at 689

(internal quotation marks omitted). In Jones's case the state appellate court classified the defense attorney's decision not to call Stone as a mere choice of trial strategy and held that decisions of this sort are "generally immune" from scrutiny unless counsel "entirely fail[ed]" to subject the prosecution's case to "meaningful adversarial testing." That was an unreasonable application of *Strickland* for several reasons.

First, the *Strickland* presumption protects *actual* strategic trial judgments. "To avoid the inevitable temptation to evaluate a lawyer's performance through the distorting lens of hindsight, *Strickland* establishes a deferential presumption that strategic judgments made by defense counsel are reasonable." *Mosley v. Atchison*, 689 F.3d 838, 848 (7th Cir. 2012). "But the presumption applies only if the lawyer actually exercised judgment." *Id.* A court adjudicating a *Strickland* claim can't just label a decision "strategic" and thereby immunize it from constitutional scrutiny. In Jones's case the state appellate court had no basis in the record to classify counsel's failure to call Stone as a strategic trial choice. *Id.* ("[O]n the limited record before the state courts, it was unreasonable to find summarily that trial counsel chose not to call Jones and Taylor as a matter of strategy."). Because there was no postconviction hearing in state court, Dosch's actual reason for omitting Stone was then unknown.

As a general matter, a defense attorney's failure to present a material exculpatory witness of which he was aware qualifies as deficient performance. *See id.* at 848–49; *Toliver v. Pollard*, 688 F.3d 853, 862 (7th Cir. 2012); *Goodman v. Bertrand*, 467 F.3d 1022, 1029 (7th Cir. 2006); *Washington v. Smith*, 219 F.3d 620, 628–29 (7th Cir. 2000). There's no doubt that Stone's testimony was exculpatory and highly material.

Without an explanation from Dosch about his reason for not calling Stone, there was no factual foundation for the state appellate court's determination that he omitted Stone as a matter of trial strategy.

Second, a defense attorney's decisions "are not immune from examination simply because they are deemed tactical." *U.S. ex rel. Hampton v. Leibach*, 347 F.3d 219, 249 (7th Cir. 2003). The state appellate court treated the *Strickland* presumption as essentially unrebuttable. That too was clearly contrary to *Strickland*.

The state court's evaluation of the prejudice question was likewise unreasonable. The court declared that Jones had the burden to show that "but for counsel's shortcomings, the outcome of the proceeding would have been different." *People v. Jones*, No. 1-05-1212, at 6–7. The court then gave two reasons why Jones hadn't met this standard: First, it was "highly likely" that Stone would have invoked his Fifth Amendment privilege not to testify; second, "several eyewitnesses" testified that Jones shot Gardner. For these reasons, the court held, "the outcome of the trial would not have been different had counsel attempted to present the testimony of codefendant Stone." *Id.* at 8.

This reasoning reflects a patent misunderstanding of *Strickland*'s prejudice standard. The state court asked too much of Jones. He did not need to show that the result of the trial *would have been* different but for counsel's error; he only needed to show a "*reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694 (emphasis added). As we've noted before, "[t]his is not a mere detail or a quibble over word-smithing." *Mosley*, 689 F.3d at

850. It's a substantive point, and one that both the Supreme Court and we have made before. *See Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Mosley*, 689 F.3d at 850. In *Mosley*, for example, the Illinois Appellate Court took the same approach to the prejudice question as it did here; we held there that the error easily satisfied § 2254(d)'s steep standard of review. 689 F.3d at 850. Indeed, we held in *Mosley* that an Illinois appellate decision applying an identically phrased prejudice formulation was clearly contrary to *Strickland*. *Id.* (citing *Williams v. Taylor*, 529 U.S. at 405–06). The same conclusion follows here.

Finally, the state court's reasons for its no-prejudice finding were so flawed as to fall outside the bounds of reasonable judicial disagreement. First, the court surmised that Stone probably would have refused to testify. Perhaps, but the court's supposition was speculative; at that time there was no basis in the record to know one way or the other. And as the dissenting judge noted, if Stone *had* refused, he would have been an unavailable witness and his testimony from his own trial would have been admissible. *People v. Jones*, No. 1-05-1212, at 9–10 (Wolfson, J., dissenting) (citing *People v. Johnson*, 517 N.E.2d 1070, 1074 (Ill. 1987); MICHAEL H. GRAHAM, CLEARY & GRAHAM'S HANDBOOK OF ILLINOIS EVIDENCE § 804.2 (7th ed. 1999)). Second, the court noted that "several eyewitnesses" testified that Jones shot Gardner, "which would have diminished the effectiveness of Stone's prior testimony had it been admissible." *Id.* at 8. Indeed, two eyewitnesses—Antonio and Rena Phillips—testified that Jones shot Gardner at close range, but the physical evidence contradicted their story. A third witness—Gaston—said only that he thought Jones had a gun in his coat pocket and may have fired through his coat. But he also told the police on the

night of the shooting that he saw Stone emerge from the alley and shoot Gardner. Against these very weak prosecution witnesses, Stone's confession would have been powerful.

For all these reasons, Jones has satisfied the requirements of § 2254(d). When a habeas petitioner successfully discharges his burden under § 2254(d), it will often be the case that his entitlement to relief naturally follows; but not "always and automatically." *Mosley*, 689 F.3d at 853. "Whether the petitioner is actually entitled to relief—whether under § 2254(a) he is in custody in violation of the Constitution and or laws or treaties of the United States—is a separate question." *Id.* In this case the two inquiries overlap so significantly that Jones's entitlement to relief flows easily from our § 2254(d) conclusion. Still, we think it best to address the § 2254(a) question separately, though we can be brief.

At the evidentiary hearing, Brian Dosch, Jones's trial counsel, offered no objectively sound reason for his decision not to present Stone as a witness at Jones's trial. He conceded that Jones asked him to call Stone. When he was asked whether Stone's testimony "would've been very helpful to Cortez Jones," he replied, "Yes" and "Oh yes" and "Yes." He acknowledged that he was fully aware of the content of Stone's testimony because he had watched the Stone/Carter trial. He could offer only one reason for omitting Stone as a witness: The police report describing Stone's confession contains some contradictory statements about whether he actually saw Gardner with a gun. According to the report, at one point during his confession, Stone admitted that he might not actually have seen a gun in Gardner's hand. But the report also clearly states that Stone told the interrogating

officers that Gardner drew a gun during the argument and aimed it at Carter.

As the district judge noted, this discrepancy in the police report may have been important to Stone's defense, but it had little significance to Jones. Stone testified that he shot Gardner to protect Carter, his half-brother, so whether he saw Gardner with a gun was crucial to his defense. But Stone's reason for firing the shots was unimportant to Jones; the key was his consistent testimony that he—and he alone—shot Gardner. The *why* of his actions was largely irrelevant, but his confession to being the sole shooter mattered a great deal. The ambiguity in the police report about whether he actually saw Gardner with a gun was not an objectively reasonable basis to omit his testimony.

On the prejudice question, we don't need to say much more than we've already said. Because the evidence—new and old—satisfies the actual-innocence standard, it necessarily also satisfies the *Strickland* test for prejudice. There is a reasonable probability that Jones would have been acquitted had his counsel presented Stone's testimony.

Illinois argues that the jury in the Stone/Carter trial must have found Stone unpersuasive, so it follows that he would not have been a persuasive witness for Jones. But the two trials were different in important ways. First, as we've already noted, the jury's rejection of Stone's "defense of brother" defense has no bearing on the case against Jones. To repeat, what's important in Jones's case is not Stone's *reason* for shooting Gardner but his consistent admission that *he alone* shot Gardner.

The jury convicted Carter too, of course, but that isn't conclusive on the prejudice question in Jones's case. The case against Carter was submitted to the jury on a theory of accountability; that is, the jury could convict Carter even if it rejected the prosecution's theory that both he and Stone were armed and fired shots at Gardner. True, Carter's conviction means that the jury *at least* accepted that Carter and Stone shared a common plan to kill Gardner and to that extent must have found Stone unpersuasive. But the case against Jones wasn't tried on an accountability theory, which in any event would have been weaker against Jones than it was against Carter.

The prosecution maintained in both trials that Gardner was murdered in retaliation for the robbery and beating at the May Street apartment. The evidence against the two men, however, was not identical for purposes of an accountability theory of guilt. Unlike Carter, Jones had no connection to Stone, Grant, or any other residents of the apartment. Indeed, Jones met Stone and the others for the first time on the day of these events. Moreover, Stone paged Carter to summon him back to the scene after 9 p.m., and it is entirely plausible to infer that Carter would know that his brother owned a gun and would be armed. No evidence suggests that Jones would have known this. With no direct evidence of a plan (and the prosecution had none), Jones would have been in a stronger position to argue that he was unaware that Stone would be armed and intended to shoot Gardner.

A final point before we move on: For unknown reasons the judge in the Stone/Carter trial excluded Stone's statement to police, which was consistent with his trial testimony and thus would have bolstered his credibility. Though not

necessarily decisive, prior consistent statements usually bear favorably on a witness's credibility. Indeed, Stone's consistency was an important factor in the district judge's actual-innocence determination. We can safely assume that Stone's prior consistent statement would have been an important factor in Jones's trial too.

Second, the case against Jones was tried to the court, and bench trials proceed on a subtly different calculus. At the evidentiary hearing, Dosch told the district judge that he watched Stone testify at his trial and thought he was "nothing special" on the witness stand and "wasn't a great witness." But he immediately backpedaled on this point, saying, "I suppose he was adequate." It's not clear what Dosch meant by this testimony; he did not elaborate. But whatever Stone's shortcomings as a witness, it's reasonable to think that the judge presiding at Jones's trial could dispassionately account for any communication difficulties or rough edges in evaluating the substance of his testimony. We note again that the district judge credited Stone's testimony in the § 2254 proceeding. In the end, the cost of calling Stone at the bench trial was so small—and the benefit of having his testimony was so great—that Dosch's decision not to call him was plainly prejudicial.

Jones has established that he is in custody in violation of his Sixth Amendment right to the effective assistance of counsel and is therefore entitled to relief under § 2254(a). The district judge was right to grant the petition for a writ of habeas corpus.

AFFIRMED.