In the

# United States Court of Appeals
## For the Seventh Circuit

No. 21-1402

JERRY S. WILSON,

*Petitioner-Appellant,*

*v.*

DAN CROMWELL,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:13-cv-01061 — **Nancy Joseph**, *Magistrate Judge.*

ARGUED SEPTEMBER 7, 2022 — DECIDED JANUARY 23, 2023
AMENDED JUNE 1, 2023

Before SYKES, *Chief Judge*, and HAMILTON and BRENNAN, *Circuit Judges*.

BRENNAN, *Circuit Judge*. Melvin Williams was shot and killed on May 23, 2009, and two other men—Robert Taylor and Romero Davis—were injured in the same shooting. A Wisconsin jury found beyond a reasonable doubt that Jerry Wilson was the gunman. He appeals from the district court's denial of his habeas petition under 28 U.S.C. § 2254, claiming

that he received constitutionally ineffective assistance from his trial and postconviction counsel.

We do not reach the merits of Wilson's claims because both are procedurally defaulted. Wisconsin state courts disposed of Wilson's ineffective assistance of trial counsel claim on adequate and independent state procedural grounds. And Wilson failed to present his ineffective assistance of postconviction counsel claim for one complete round of state court review. The default of these claims is not excused by a sufficient showing of actual innocence, barring federal review of the merits. Accordingly, we affirm the district court's denial of habeas relief.

**I**

*The Shooting, Investigation, and Charges*. In the early morning hours of May 23, 2009, three people were shot during an "after-set" party[1] at a two-story duplex unit on North 44th Street in Milwaukee. The party was large enough that attendees were both inside the duplex and outside in the street.

Just before gunfire began, two vehicles passed through the crowded street in front of the duplex, and the cars' occupants exchanged insults with party attendees in the roadway. The drivers parked nearby, and the passengers—who included the three eventual victims—walked back to the party to find the people who had yelled at them. A fistfight broke out in the street, and then the shooting started.

Melvin Williams suffered a fatal gunshot wound to the chest and died that day. The two other victims survived. A

---

[1] According to witnesses at trial, an after-set party is like a house party or block party, where guests pay an admission fee and alcohol is served.

bullet struck Robert Taylor in the foot, and Romero Davis received wounds to his stomach and right calf. Neither Taylor nor Davis could identify who shot them.

Investigation of the crime scene yielded only a modest amount of physical evidence. Law enforcement recovered five .40 caliber bullet casings, four .38 caliber casings, a .40 caliber bullet, and several bullet fragments at the scene but never located the murder weapon. In general, the .38 caliber casings were damaged and flattened while the .40 caliber casings were in better condition.

Police spoke with eyewitnesses early in the investigation. Shakira King attended the after-set party and identified Wilson as the gunman to law enforcement. She also picked Wilson out of a photo lineup the day after the crime. Antwan Smith-Currin, who lived in the upstairs duplex unit at the time, also identified Wilson as the gunman in a photo array.

According to detective testimony, Samantha Coats and Sanntanna Ross identified Wilson as the shooter as well, although at trial the women either denied having made such identification or sharply qualified their prior statements. Officers arrested Wilson in July 2009, and the State charged him with one count of reckless homicide and two counts of reckless endangerment.

Smith-Currin testified at Wilson's preliminary hearing and identified him as the gunman. When asked whether he saw other gunmen besides Wilson, Smith-Currin answered, "No, sir," but acknowledged that "People w[ere] trying to say

that I was shooting because I was on the porch."[2] At the hearing, the trial court found probable cause to believe that Wilson committed a felony and ordered him bound over for trial.

*Jury Trial*. In August 2010, Wilson went to trial with attorney Glen Kulkoski as his counsel. Given the minimal physical evidence, the case centered on the testimony of four eyewitnesses. Smith-Currin took the stand and identified Wilson as the gunman, consistent with his previous statements to law enforcement. He testified to seeing Wilson walk between two houses, approach the crowd in the street, and open fire with a handgun. Yet Smith-Currin's testimony contained discrepancies. For instance, he testified to standing on the porch when he saw Wilson open fire, but he was cross-examined with his prior sworn statement that he had been in the street when he saw the shooting.

King also testified at trial and identified Wilson as the shooter. King's account largely mirrored Smith-Currin's: Wilson emerged from between two houses on the same side as the duplex and opened fire. But King also provided certain discrepant details. For example, she was neither consistent in describing her position relative to the gunman, nor certain of the distance between them. At trial, she first suggested that she was two feet from the gunman. But following a courtroom distance demonstration, she changed that estimate to fifteen feet. She also said that the shooter had a ponytail but had previously told police that he wore his hair in braids. Finally, King testified she was not involved in the street fight, but previously told officers that she had participated.

---

[2] The two-story duplex has an upper and a lower porch. Smith-Currin testified at trial that he was on the lower porch at the time of the shooting.

The State also called two other eyewitnesses to testify. Sanntanna Ross said she did not see who shot because she was fighting in the street during the shooting. That prompted the State to try to impeach her with her prior statements to law enforcement inculpating Wilson. Per testimony from investigating detectives, Ross identified Wilson as the shooter and recognized his face in a photograph. In response to the impeachment evidence, Ross claimed she felt pressure from police to "get [her] to say things that [she] didn't want to say."

Samantha Coats testified that, in the seconds before the shooting, she was looking out of a nearby second-story window with a view of the street. She described seeing an individual come into the street near the duplex and start shooting. When asked at trial, she agreed that the gunman's silhouette fit Wilson's description, but she did not make an affirmative identification. As with Ross, the State tried to impeach Coats with prior statements. According to police documents and testimony, Coats selected Wilson's photograph during a photo lineup, indicated he was the shooter, and wrote "I'm sure is the shooter" on the photo lineup paper near her signature. In response, Coats explained she was "under a lot of pressure" from law enforcement and believed that she "was going to be taken into custody." Coats likewise agreed with defense counsel that her statements to police were made to please the detectives and to avoid getting herself in trouble.

The State called other witnesses to talk about the physical evidence. Detectives described where they found the different bullet casings and explained that the location of the .40 caliber casings was generally consistent with a gunman firing from an alleyway near the duplex. A firearm examiner opined that

the .38 caliber casings were all fired out of one gun while the .40 casings were all fired from a second weapon.

After the State rested, Wilson called three witnesses in his defense. Kawana Robinson, Aaron Lee, and Shantell Johnson all testified that they did not see Wilson at the after-set party the night of the shooting.

All in, the accounts of the trial witnesses varied. For instance, the shooter's height was described as five-foot-three by one witness, and five-foot-eleven by another. One witness said the shooter was wearing a fleece-style top with no hood, while others testified he was either wearing a baseball hat or had a hood up. There was also disagreement about whether the shooter wore his hair in a ponytail or in braids. Finally, at least two witnesses claimed it was too dark to discern any details about the gunman.

The jury found Wilson guilty on all three counts, and the court sentenced him to 28 years' imprisonment.

*Wilson's § 974.02 Proceedings and Possible New Evidence*. Post-judgment, two events unfolded simultaneously. In the fall of 2010, Wilson obtained postconviction counsel (Thomas Simon)[3] and challenged his conviction. Wilson began by pursuing a claim for ineffective assistance of trial counsel which, in Wisconsin, is brought as a § 974.02 motion in the trial court. *See* WIS. STAT. §§ 809.30, 974.02; *Lee-Kendrick v. Eckstein*, 38 F.4th 581, 586 (7th Cir. 2022). Wilson filed that motion in April

---

[3] Throughout we refer to Thomas Simon, who assisted Wilson during his § 974.02 proceeding, as Wilson's "postconviction counsel." "Postconviction counsel" refers exclusively to Simon and should not be confused with Christopher August, who assisted Wilson with his § 974.06 state collateral attack, or with Wilson's current federal habeas counsel.

2011, arguing that trial counsel had failed to properly investigate the case, raise a key defense, and thoroughly cross-examine a State witness.

Also during the fall of 2010, Wilson had been investigating new evidence. He alleges that three to four months after the trial concluded, he became aware of a new eyewitness through a fellow inmate named Deangelo Harvey. In late 2010, Harvey purportedly told Wilson that a woman living in the duplex was home on the night of the shooting, but he did not provide a name or any other specifics. Nonetheless, Wilson claims he eventually received a letter from that woman—Lakisha Wallace—sometime between March and June of 2011. Per Wilson, Wallace explained in her letter that she had "information about what happened that night" but provided no other details. Wilson said he wrote back asking if she would testify on his behalf and requesting her contact information. In a third letter, Wallace allegedly agreed and provided Wilson a post office box number.[4] Thereafter, Wilson claims that his mother got in touch with Wallace and that Wallace spoke with his postconviction counsel. Nonetheless, there is no evidence that Wilson's postconviction counsel ever obtained an affidavit from Wallace or involved her in the direct appeal.

The Wisconsin trial court denied Wilson's § 974.02 motion on April 18, 2011, and Wilson appealed. In 2012, the Wisconsin Court of Appeals denied relief, and the Wisconsin Supreme Court declined to grant review, ending Wilson's direct appeal.

*Wilson's § 974.06 Proceedings.* Almost a year after Wilson lost his direct appeal, he acquired a notarized statement from

---

[4] Wilson did not keep any of the letters nor did he make copies.

Wallace—the same individual with whom he had allegedly exchanged letters in 2011. In her July 1, 2013, statement, Wallace accused Smith-Currin of being the shooter and said that Wilson was innocent. Wilson then filed a pro se postconviction motion under § 974.06 in Wisconsin state court, alleging ineffective assistance of both trial and postconviction counsel. He also sought a hearing on the "newly discovered" Wallace testimonial evidence. The state trial court denied relief, and the appellate court affirmed.

Two years later, though, Wilson's state collateral challenge gained new life. In September 2016, he renewed his claims by petitioning the Wisconsin Supreme Court for review. That court ordered the State to submit a response, in which the State acknowledged that Wilson was entitled to an evidentiary hearing on the newly discovered evidence. As the Wisconsin Supreme Court summarized, the State conceded in its response that "if the allegation at issue is accepted as true, there is a reasonable probability that a jury, looking at the old evidence and the new evidence, would have a reasonable doubt as to Mr. Wilson's guilt." So, the Wisconsin Supreme Court granted the petition for review and remanded on the newly discovered evidence claim. It held in abeyance the other claims, including Wilson's ineffective assistance of postconviction counsel claim.

In August 2017, an evidentiary hearing was held at which Wallace testified to the information in her July 2013 statement. She explained that, on the night of the shooting, she was living on the first floor of the duplex, and there was a big party going on in the upstairs unit where Smith-Currin lived. In the hours leading up to the shooting, Wallace witnessed Smith-Currin drinking, smoking, and ingesting pills on the porch.

As a result, Wallace believed that Smith-Currin was under the influence at the time of the shooting: "Yeah, he was very much so under the influence. Like you could tell he was high, you know."

As the party ramped up, Wallace said she noticed commotion outside her unit and observed Smith-Currin ask his brother for a firearm. She next saw Smith-Currin go outside with the handgun and yell that the partygoers should move away from the house. According to Wallace, Smith-Currin then ran down the front steps and opened fire on the people in the street. During the shooting, Wallace claims to have heard multiple weapons firing: "It wasn't like it was just one gun. Like you could hear different guns going off. It wasn't like just one person shooting outside." Wallace testified further that, once the shooting stopped, Smith-Currin tried to come inside her unit. She refused him entry but overheard Smith-Currin tell his brother that he had just shot someone. Wallace also reported hearing Smith-Currin discuss pinning the crime on Wilson.

Wilson took the stand next. He explained how Wallace reached out to him after his conviction in 2011, and he described their alleged exchange of letters. Wilson also testified that, in the hours before the party, he had helped set up a music system for Wallace at the duplex.

Yet despite having been to Wallace's residence just hours before the shooting, Wilson said it never occurred to him that she might have information about the incident. Indeed, Wilson never brought Wallace to trial counsel's attention or otherwise reached out to her pretrial. Per Wilson, it was not until Wallace wrote to him that he realized she might have helpful information. And while Wilson claimed he notified

postconviction counsel about Wallace during his direct appeal, he could not explain why his counsel failed to act on the Wallace lead.

After the hearing, the state trial court denied Wilson's request for a new trial. In its oral ruling, the trial court found that, "[g]enerally, Miss Wallace's testimony was credible and worthy of belief."[5] But the judge assessed Wilson's statements differently, explaining, "Mr. Wilson's testimony is not credible. It is not worthy of belief. I give his testimony zero weight." The court observed that Wilson had recounted receiving letters from Wallace, yet Wallace testified she was illiterate. As the court explained, "Miss Wallace doesn't have the ability to correspond with the defendant. She can't read. She can't write." At bottom, the trial court held that Wilson was negligent in failing to present the newly discovered evidence to the jury and thus not entitled to a new trial.

Wilson then made a strategic decision to streamline his case. He voluntarily dismissed his petition for review (with his ineffective assistance of postconviction counsel claim), which the Wisconsin Supreme Court had held in abeyance, so that he could appeal the denial of his request for a new trial based on new evidence. Nonetheless, Wilson's appeal of his newly discovered evidence claim failed. The Wisconsin Court of Appeals agreed with the trial court that Wilson was negligent in not presenting the Wallace evidence earlier and denied relief. Soon after, the Wisconsin Supreme Court declined

---

[5] The trial court qualified this credibility finding somewhat, explaining, "Miss Wallace does have some limitations that undermine her credibility, not enormously, but there are areas where her testimony could be more credible." One such issue was that Wallace "ha[d] some difficulties in sequence of events."

review. Having lost on the newly discovered evidence claim and having voluntarily dismissed his other claims pending in the Wisconsin Supreme Court, the doors to state court relief closed for Wilson.

*Habeas Corpus Petition*. Wilson then turned to federal court. He had timely filed an original federal habeas petition on September 20, 2013, which the district court stayed pending exhaustion of state proceedings. After his state court path was foreclosed, he amended his habeas petition on July 30, 2019, alleging three grounds for relief: (1) ineffective assistance of trial counsel; (2) ineffective assistance of postconviction counsel; and (3) newly discovered evidence.

The district court ruled that Wilson procedurally defaulted his claim for ineffective assistance of trial counsel. Likewise, the court decided that the default was not excused because Wilson failed to make a sufficiently strong showing of actual innocence. On the ineffective assistance of postconviction counsel claim, the district court did not explicitly engage with procedural default. Instead, the court found that Wilson could not show constitutionally ineffective assistance on the merits. Finally, the district court disposed of the newly discovered evidence claim, finding that the discovery of new evidence alone does not qualify as grounds for federal habeas relief absent an independent constitutional violation. The district court also denied Wilson a certificate of appealability.

At Wilson's request, we granted a certificate of appealability under 28 U.S.C. § 2253(c)(2) for the following issues:

- Whether Wilson has established ineffective assistance of trial counsel;

- Whether Wilson has made a strong enough showing of actual innocence to excuse any procedural defaults;

- Whether the federal constitutional right to counsel applies to Wisconsin postconviction counsel's performance; and

- Whether, if the federal constitutional right to counsel applies to Wisconsin post-conviction counsel, the standard for ineffective assistance is met here.

After reviewing the petition and record, we affirm the district court's denial of Wilson's petition for federal habeas relief for the reasons that follow.[6]

**II**

As noted, the district court dismissed Wilson's habeas petition. "When reviewing a district court's ruling on a habeas corpus petition, we review the district court's factual findings for clear error and rulings on issues of law *de novo*." *Sanders v. Radtke*, 48 F.4th 502, 508 (7th Cir. 2022) (quoting *Lee-Kendrick*, 38 F.4th at 585–86). As to whether a claim is procedurally defaulted, our review is de novo. *Garcia v. Cromwell*, 28 F.4th 764, 771 (7th Cir. 2022) (citing *Johnson v. Thurmer*, 624 F.3d 786, 789 (7th Cir. 2010)).

---

[6] The court thanks Vladimir J. Semendyai, Esq., Andrew P. LeGrand, Esq., Pooja Patel, Esq., and Zachary T. Reynolds, Esq. of Gibson, Dunn & Crutcher LLP for accepting this appointment and for their fine representation of Wilson throughout this appeal.

**A**

We first consider whether Wilson's claim for ineffective assistance of trial counsel is procedurally defaulted. The State contends it is because the state court disposed of Wilson's claim on an adequate and independent state law ground. Wilson seems to acknowledge this but focuses instead on overcoming default through the actual innocence gateway. We hold that Wilson's claim for ineffective assistance of trial counsel is indeed procedurally defaulted.

"[A] state prisoner must exhaust available state remedies before presenting his claim to a federal habeas court." *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017) (citing 28 U.S.C. § 2254(b)(1)(A)). A "corollary" to that rule is that federal courts may not review federal claims that the state court denied on an adequate and independent state procedural ground. *Id.* So, we begin by examining the state court's treatment of Wilson's claim for ineffective assistance of trial counsel.

The Wisconsin Court of Appeals was the final state court to evaluate Wilson's ineffective assistance of trial counsel claim, and it denied that claim as inadequately pleaded under *State v. Allen*, 682 N.W.2d 433 (Wis. 2004).[7] Per Wisconsin law, a defendant claiming ineffective assistance of counsel must plead "sufficient material facts—*e.g.*, who, what, where, when, why, and how—that, if true, would entitle him to the

---

[7] The Wisconsin Supreme Court denied Wilson's ensuing petition for review without comment. Therefore, we look to the Wisconsin Court of Appeals' decision. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) (holding that federal courts on habeas review look to the "last related state-court decision that [ ] provide[s] a relevant rationale").

relief he seeks." *Id.* at 436; *see also id.* at 441–42; *State v. Bentley*, 548 N.W.2d 50, 53–54 (Wis. 1996). State trial courts may deny such a claim without a hearing based on a defendant's recitation of "conclusory allegations" or failure to "raise facts sufficient to entitle the movant to relief." *Allen*, 682 N.W.2d at 437; *see also Whyte v. Winkleski*, 34 F.4th 617, 622 (7th Cir. 2022) (describing the *Allen* pleading standard).

Applying that standard, the Wisconsin Court of Appeals determined that Wilson's ineffective assistance of counsel claim was insufficiently pleaded under *Allen*: "Despite a lengthy recitation of the standards set forth in *Bentley* and *Allen* for a sufficient postconviction motion, Wilson fails to make sufficient allegations to warrant relief." The state appellate court continued, "Because the allegations in the postconviction motion were insufficient under *Bentley* and *Allen*, whether to grant a hearing was committed to the [trial] court's discretion. We discern no erroneous exercise of that discretion." In denying Wilson's claim for ineffective assistance of trial counsel under the *Allen* standard, the state court of appeals relied on an adequate and independent state law ground.

As stated, federal courts "may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule." *Davila*, 137 S. Ct. at 2064. The *Allen* standard at issue here is both adequate and independent. As to adequacy, "For a state-law ground to be 'adequate,' it must be 'firmly established and regularly followed.'" *Clemons v. Pfister*, 845 F.3d 816, 820 (7th Cir. 2017) (quoting *Walker v. Martin*, 562 U.S. 307, 316 (2011)). The state law ground also "must not have been applied in a manner that

'impose[s] novel and unforeseeable requirements without fair or substantial support in prior state law' or 'discriminate[s] against claims of federal rights.'" *Id.* (quoting *Walker*, 562 U.S. at 320–21). When examining the adequacy of a state law procedural ground, our review is limited to whether the procedural ground "is a firmly established and regularly followed state practice at the time it is applied, not whether the review by the state court was proper on the merits." *Lee v. Foster*, 750 F.3d 687, 694 (7th Cir. 2014).

We have previously held the *Allen* pleading standard is a firmly established and regularly followed state practice, and we do so here. In *Lee v. Foster*, the Wisconsin Court of Appeals denied Lee's claim for ineffective assistance of counsel and "found that the allegations regarding [Lee's] postconviction counsel's performance were conclusory and legally insufficient" under the *Allen* standard. *Id.* at 693. On federal habeas review, we held that Lee's claim was procedurally defaulted and that the *Allen* rule "is a well-rooted procedural requirement in Wisconsin and is therefore adequate." *Id.* at 694. So, the *Allen* standard functions as an adequate state law ground for denial of Wilson's ineffective assistance of trial counsel claim.

The *Allen* pleading standard is also independent. A state-law procedural ground satisfies the independence prong when "the court actually relied on the procedural bar as an independent basis for its disposition of the case." *Lee-Kendrick*, 38 F.4th at 587 (quoting *Garcia*, 28 F.4th at 774). Here, the Wisconsin Court of Appeals explicitly referenced and relied upon the *Allen* procedural rule in disposing of Wilson's claim for ineffective assistance of trial counsel. Thus, the *Allen* standard served as an independent state law ground for denying

Wilson's claim. We have reached the same conclusion in other cases implicating the *Allen* standard. *See, e.g.*, *Lee*, 750 F.3d at 693 (holding that the *Allen* rule "clearly served as an independent basis for the court's denial of [petitioner's] motion"); *Triplett v. McDermott*, 996 F.3d 825, 829–30 (7th Cir. 2021) (concluding that the *Allen* pleading standard is an adequate and independent basis for the state court's denial of petitioner's ineffectiveness claim). So, the district court properly ruled that Wilson's ineffective assistance of trial counsel claim was procedurally defaulted, and we affirm that decision.

**B**

Next up is Wilson's claim that his postconviction counsel rendered ineffective assistance during the § 974.02 proceeding. This claim implicates the proper classification of § 974.02 proceedings, but in *Lee-Kendrick* we already decided that: "[A] claim of ineffective assistance of counsel under [Wisconsin Statute] § 974.02 is part of a direct appeal rather than a request for collateral review." 38 F.4th at 587. So, 28 U.S.C. § 2254(i), which bars federal habeas relief for the ineffective assistance of counsel at collateral post-conviction proceedings, does not preclude Wilson's claim here.

With that, we move to whether Wilson procedurally defaulted his claim for ineffective assistance of postconviction counsel. The State argues that Wilson defaulted this claim by failing to present it for one complete round of state court review. Wilson does not vigorously contest that position, focusing instead on overcoming default.

Under 28 U.S.C. § 2254(b)(1)(A), a petition for federal habeas relief shall not be granted unless it appears that "the applicant has exhausted the remedies available in the courts of

the State." Applying that provision, we have held that "[t]o fairly present [a] federal claim, a petitioner must assert that claim throughout at least one complete round of state-court review, whether on direct appeal of his conviction or in post-conviction proceedings." *Richardson v. Lemke*, 745 F.3d 258, 268 (7th Cir. 2014) (citing *McDowell v. Lemke*, 737 F.3d 476, 482 (7th Cir. 2013)). The complete round rule "means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory." *Id.* (citing *Lewis v. Sternes*, 390 F.3d 1019, 1025–26 (7th Cir. 2004)).

Wilson voluntarily dismissed his claim for ineffective assistance of postconviction counsel before the Wisconsin Supreme Court ruled on it. That voluntary dismissal effected the same outcome as not filing a petition in the first place—the Wisconsin Supreme Court never evaluated his claim for ineffective assistance of postconviction counsel. As a result, Wilson's claim for ineffective assistance of postconviction counsel is procedurally defaulted. *See Johnson v. Foster*, 786 F.3d 501, 504–05 (7th Cir. 2015) (holding that defendant's failure to file a petition for review with the Wisconsin Supreme Court violated the complete round of review rule). Without an entire round of state-court review, Wilson procedurally defaulted his claim.

## III

Where, as here, a petitioner's claims are procedurally defaulted, federal habeas review is precluded unless the prisoner demonstrates either of two things. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The petitioner may demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law," or he may "demonstrate that

failure to consider the claims will result in a fundamental mis-
carriage of justice." *Id.* Moreover, "[t]he miscarriage of justice
exception 'applies only in the rare case where the petitioner
can prove that he is actually innocent of the crime of which he
has been convicted.'" *Blackmon v. Williams*, 823 F.3d 1088, 1099
(7th Cir. 2016) (quoting *McDowell*, 737 F.3d at 483); *see also
Sawyer v. Whitley*, 505 U.S. 333, 339 (1992). Wilson does not
allege cause and prejudice,[8] so we focus on the actual inno-
cence exception.

Wilson maintains that he has made a sufficient showing of
actual innocence and urges us to review the merits of his
claims. First, he suggests that the State has already admitted
that statements made during state court proceedings would
have given a jury reasonable doubt, and thus conceded the
question of actual innocence. Wilson further asserts that Wal-
lace's testimony is sufficiently compelling and thus "there can
be little doubt that [he] has satisfied the actual innocence
standard." More precisely, Wilson contends that the Wallace
testimony is persuasively exculpatory and that Smith-Cur-
rin's preliminary hearing statements corroborate Wallace's
account. He also tries to downplay the probative force of the
inculpatory record evidence.

The State responds that the Wallace evidence—including
when considered with the rest of the trial evidence—falls
short of sufficiently establishing actual innocence. It contends
Wallace's testimony is uncorroborated and in tension with
other testimonial and physical evidence. It also highlights

---

[8] At oral argument Wilson's counsel informed us that Wilson was not
pursuing relief on a cause-and-prejudice theory. *See* Oral Arg. at 6:12–7:02.

that, even if true, Wallace's account does not technically rule Wilson out as a potential gunman.

We start with whether the State conceded that Wilson has made a sufficient showing of actual innocence. Wilson is correct that the State previously admitted he was entitled to a hearing on the newly discovered evidence. After Wilson filed a pro se motion about that evidence, both the state trial and appellate courts declined his request for a hearing. Wilson appealed to the Wisconsin Supreme Court, and on that court's direction, the State filed a response conceding that Wilson was entitled to a hearing. Specifically, the State admitted it was "reasonably probable that if a jury were to find Wallace credible, her testimony would create a reasonable doubt about whether Wilson was the shooter."

Even so, the federal standard for a showing of actual innocence demands more than what the State conceded. When we evaluate an actual innocence claim for purposes of federal habeas review, the appropriate question is whether "it is more likely than not that no reasonable juror would have convicted [Wilson] in the light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324. The burden rests on the petitioner to make the requisite showing. *Id.* at 327. This is a more demanding standard than what is required to merit a hearing. The State's concession that Wilson was entitled to a state-court evidentiary hearing does not also serve as an admission that Wilson has shown actual innocence. Language from *Schlup* clarifies this point. There, the

Supreme Court explained that "[t]he meaning of actual inno-
cence … does not merely require a showing that a reasonable
doubt exists in the light of the new evidence, but rather that
no reasonable juror would have found the defendant guilty."
*Id.* at 329. So, the State did not concede the question of actual
innocence.

We further hold that Wallace's testimony does not suffi-
ciently establish Wilson's actual innocence. At the outset, we
acknowledge that this evidence is both new and credible,
which are predicate requirements for the actual innocence
gateway. *Id.* at 324. The evidence is new because it was not
presented at Wilson's trial, and it is credible because the Wis-
consin Court of Appeals found that Wallace's testimony was
generally worthy of belief. In this appeal, the State also recog-
nizes as much.

Yet the presentation of new and credible evidence does not
automatically satisfy the *Schlup* standard for actual innocence.
Instead, the new evidence must be considered along with the
existing evidentiary record. "In applying this standard, we
must consider all the evidence, both old and new, incriminat-
ing and exculpatory, without regard to whether it would nec-
essarily be admitted at trial." *Blackmon*, 832 F.3d at 1101 (citing
*House v. Bell*, 547 U.S. 518, 538 (2006)). From there, we make a
probabilistic determination about what reasonable jurors
would do. *House*, 547 U.S. at 538. The requisite probability is
established only if Wilson shows that "it is more likely than
not that no reasonable juror would have convicted him in the
light of the new evidence." *Schlup*, 513 U.S. at 327. Finally, we
always keep in mind that the "*Schlup* standard is demanding
and permits review only in the 'extraordinary' case." *House*,
547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327); *see also*

*McQuiggin v. Perkins*, 569 U.S. 383, 401 (2013) ("We stress once again that the *Schlup* standard is demanding.").

Adhering to the rigor of the *Schlup* standard for actual innocence, we cannot say that the Wallace evidence is so compelling and unequivocal that no reasonable juror would have convicted Wilson in the light of it.[9] Wallace's testimony just adds a new voice to a highly complex, and often inculpatory, evidentiary record. For instance, both Smith-Currin and King still unequivocally identified Wilson as the gunman and described him emerging from an alleyway and opening fire. We conclude that matching testimony from Smith-Currin and King, delivered at trial and without qualification, likely would prevent reasonable jurors from placing significant reliance on Wallace's account presented more than four years later[10]—especially since a detective testified that the location of the .40 bullet casings was generally consistent with a shooter coming from the alleyway. *See Schlup*, 513 U.S. at 332 ("[T]he court may consider how the timing of the submission … bear[s] on the probable reliability of that evidence.").

Other record evidence, when considered in conversation with the Wallace testimony, also stops us from concluding

---

[9] In applying *Schlup*, we are mindful of the distinction between *Schlup*'s gateway actual-innocence standard and the *Jackson v. Virginia*, 443 U.S. 307 (1979), standard applicable to claims of insufficient evidence. As the amendments made to the majority opinion and dissent emphasize, the standards are not equivalent. *See House*, 547 U.S. at 538.

[10] Our dissenting colleague points out that King and Smith-Currin did not identify Wilson as the gunman the night of the shooting. But King identified Wilson in a photo array the following day, and Smith-Currin did the same less than a month later. Wallace, by contrast, waited years before coming forward with her version of events.

"that more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538. The State's impeachment evidence of Samantha Coats and Sanntanna Ross—which included Coats' prior identification of Wilson as the gunman during a photo lineup—would similarly undercut, in the minds of reasonable jurors, Wallace's alternative account of the shooting. Wallace's testimony and the physical evidence also do not foreclose the existence of multiple shooters. Wallace testified she heard multiple guns firing, and detectives recovered two different sets of bullet casings. She explained "[i]t wasn't like it was just one gun. Like you could hear different guns going off. It wasn't like just one person shooting outside." So, a reasonable juror might consider Wallace's testimony and still find that Wilson was one of two (or more) shooters. Plus, no other witness's account of the shooting matches Wallace's. The closest corroboration of Wallace's version comes from Smith-Currin's preliminary hearing statement, in which he testified that people thought he was shooting. But that advances the ball little, because Wallace is still the only identified witness to accuse Smith-Currin of being the gunman.

The discrepancies in testimony do not end there. As mentioned, witnesses provided varied accounts of the shooting and the shooter. Whether it is the gunman's height, hair, or clothing, the witnesses' recollections differed. So, even with Wallace's testimony, we are left with a series of competing eyewitness accounts, the balance of which would strongly point to Wilson's guilt for reasonable jurors. When evaluating a claim of actual innocence, our role "is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *House*, 547 U.S. at 538. As the dissent

emphasizes, a state court found Wallace's testimony to be credible. But that finding does not mean that reasonable jurors would necessarily credit Wallace's account of the shooting over that of any other witness, such as Smith-Currin or King. Compelling inculpatory record evidence remains, notwithstanding Wallace's credibility, so considering "all the evidence, old and new, incriminating and exculpatory," *id.* (cleaned up), we cannot say that it is more likely than not that no reasonable juror would have convicted Wilson in the light of the new evidence.

Our conclusion accords with relevant precedent. In *Blackmon*, the court heard competing eyewitness testimony. 823 F.3d 1088. There, two gunmen approached a victim and opened fire. *Id.* at 1092. The ensuing bench trial focused on the identity of the second gunman, and eyewitness testimony was paramount. *Id.* at 1092, 1095–96. Approximately two months after the shooting, two eyewitnesses identified Blackmon as one of the triggermen through photo lineups and in-person lineups. *Id.* at 1094. Those same witnesses identified Blackmon as the gunman at trial. *Id.* at 1093–95. In response, Blackmon called three defense witnesses. Two of those witnesses provided an alibi for Blackmon; the third claimed to have watched the shooting and testified that Blackmon was not present at the scene. *Id.* at 1095–96. The presiding judge determined that Blackmon was one of the shooters and found him guilty. *Id.* at 1096.

Like Wilson, Blackmon challenged his conviction through federal habeas and tried to pass through the actual innocence gateway for certain defaulted claims. *Id.* at 1100–01. To that end, Blackmon provided two new eyewitness affidavits. *Id.* at 1097. Each of the new witness affidavits claimed that

Blackmon was not one of the gunmen. *Id.* Reviewing all the evidence—old and new—this court concluded that Blackmon's showing of actual innocence was insufficient. *Id.* at 1101–02. In reaching that conclusion, this court noted that the new evidence merely contrasted with the State's two credible eyewitness accounts. *Id.* And the new eyewitnesses did not come forward until eight years after the shooting. *Id.* at 1102. So, the "balance between inculpatory and exculpatory witnesses [was] not enough to meet the demanding *Schlup* standard for actual innocence." *Id.*

The facts here track those in *Blackmon*. Like Blackmon, Wilson offers new eyewitness testimony into a factual record occupied by contrasting eyewitness statements. But as ruled in *Blackmon*, the introduction of new eyewitness testimony does not amount to a showing of actual innocence when strong and credible testimony to the contrary remains. Just as the two new affidavits in *Blackmon* merely added to the balance of inculpatory and exculpatory evidence, so too does Wallace's testimony. Even with the Wallace evidence, we are left with a complex factual record pointing in different directions.[11] We therefore hold that Wilson has not satisfied the *Schlup* standard for actual innocence. Other cases from this court also support our conclusion. *See, e.g.*, *Smith v. McKee*, 598 F.3d 374, 387–88 (7th Cir. 2010) (concluding insufficient showing of

---

[11] The dissent observes that, unlike in *Blackmon*, 823 F.3d at 1093, the inculpatory witnesses here knew Wilson before the shooting. For our dissenting colleague, that prior knowledge dilutes the weight of the photo lineup identifications by King and Smith-Currin. But Wallace was not a stranger to Wilson or Smith-Currin, either. Indeed, at the evidentiary hearing Wallace testified she had been around Smith-Currin "plenty of times" before the shooting, and Wilson helped set up the music at Wallace's apartment on the night of the crime.

actual innocence where petitioner's two new affidavits did not sufficiently counter the state's evidence, which included two eyewitness identifications and a self-inculpatory statement); *Hayes v. Battaglia*, 403 F.3d 935, 937–38 (7th Cir. 2005) (holding that a draw between the number of eyewitnesses for and against defendant—six new exculpatory witnesses versus the state's six inculpatory trial witnesses—"cannot establish that no reasonable factfinder would have found the applicant guilty") (cleaned up).

Finally, *Jones v. Calloway*, 842 F.3d 454 (7th Cir. 2016), is instructive as a rare case where we concluded that the defendant had made a sufficient showing of actual innocence. Jones was convicted of murder and sought federal habeas relief. The district court held his claims procedurally defaulted, forcing Jones to rely on the actual innocence gateway to excuse his default. *Id.* at 459. The new evidence Jones brought to bear on his case was exceptional. Michael Stone, another man present at the murder scene, provided new testimony that he was the lone shooter. *Id.* at 460. And his testimony was compelling. Stone had previously turned himself in for the crime, confessed to the shooting within days, identified the murder weapon, and given testimony that was consistent with the case's forensic evidence. *Id.* at 462. Stone's story of the shooting had also remained consistent for over a decade. *Id.* at 463. The district court found a sufficient showing of actual innocence, and this court agreed. *Id.* at 460, 462.

In *Jones*, the new witness took the stand and personally claimed sole responsibility for the crime. *Id.* at 462. His testimony was consistent with the physical evidence as well, whereas the testimony of prosecution witnesses in that case was often in tension with the forensics. *Id.* The Wallace

evidence is not so forceful. Her eyewitness testimony contrasts with that of Smith-Currin and King (and to a lesser degree, Coats and Ross), but likely would not overcome it in the minds of reasonable jurors. Reviewing all the facts, Wilson has not demonstrated "that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt." *House*, 547 U.S. at 538. Accordingly, Wilson has not sufficiently shown actual innocence.

## IV

Given the unexcused procedural default, we do not reach the merits of Wilson's ineffective assistance of trial and post-conviction counsel claims.

In summary, Wisconsin state courts disposed of Wilson's ineffective assistance of trial counsel claim on adequate and independent state grounds, and he failed to present his ineffective assistance of postconviction counsel claim for one complete round of state court review. So, both of his claims are procedurally defaulted. Wilson attempts to overcome these defaults, but he fails to make a sufficient showing of actual innocence. Even considering Wallace's testimony, we cannot conclude that it is more likely than not that no reasonable juror would have convicted Wilson. The *Schlup* standard for actual innocence is high and reserved for the exceptional case, a threshold Wilson does not clear here.

For these reasons, the district court's denial of Wilson's petition for federal habeas relief is AFFIRMED.

HAMILTON, *Circuit Judge*, dissenting. During post-conviction hearings in the state courts, Lakisha Wallace testified that the shooter was actually Antwan Smith-Currin, who was also the state's chief witness against petitioner Wilson. Ms. Wallace witnessed the incident from the bottom floor of the duplex where she lived downstairs from Smith-Currin. She testified that she heard Smith-Currin yell to his brother to give him a gun and then saw Smith-Currin wave a handgun on the front porch of the duplex, open fire, and run into the crowd while shooting. According to Ms. Wallace, Smith-Currin immediately came back inside and shouted to his brother that he had "just offed" someone. Ms. Wallace further testified that in the days after the shooting, she heard Smith-Currin say that he planned to blame the crime on Wilson. She also offered a plausible motive for the plan to blame Wilson. Smith-Currin had seen his girlfriend with Wilson on the duplex porch the day before the shooting and was angry about them being together.

The extraordinary feature of this habeas case is the combination of two facts. First, the state agreed during state court proceedings that "[i]t is reasonably probable that if a jury were to find Ms. Wallace credible, her testimony would create a reasonable doubt about whether Wilson was the shooter." Second, when Ms. Wallace actually testified before a state court judge, that judge found her credible. Under these unusual circumstances, and given other significant weaknesses in the state's case, we should find that Wilson has made a showing of innocence sufficient to excuse his procedural default. We should remand to the district court for an evidentiary hearing on his claims of ineffective assistance of counsel.

My colleagues and I agree on all but that one decisive issue. As the majority opinion explains, under Wisconsin's unusual procedures for post-conviction relief, Wilson had a federal constitutional right to effective assistance of counsel in post-trial proceedings under Wisconsin Statute § 974.02. Ante at 16, citing *Lee-Kendrick v. Eckstein*, 38 F.4th 581, 587 (7th Cir. 2022). We also agree that Wilson procedurally defaulted his ineffective assistance claims in the state courts. Ante at 17. Where we disagree is whether Wilson has shown "actual innocence" so as to excuse his procedural default.

To avoid the consequences of his procedural default, Wilson offers the testimony of Lakisha Wallace to show that he is actually innocent. See generally *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992); *Blackmon v. Williams*, 823 F.3d 1088, 1099 (7th Cir. 2016). To do so, Wilson must come forward with new evidence showing "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995); see also *McQuiggin v. Perkins*, 569 U.S. 383, 386, 390 (2013). His evidence must be reliable and may take the form of "exculpatory scientific evidence, *trustworthy eyewitness accounts*, or critical physical evidence." *Gladney v. Pollard*, 799 F.3d 889, 896 (7th Cir. 2015) (emphasis added), quoting *Schlup*, 513 U.S. at 324.

In applying this test, it is essential to remember that the hypothetical jurors would have to examine all the new and old evidence and be convinced of guilt *beyond a reasonable doubt*. The reasonable doubt lens was, after all, the point of the Supreme Court's decision in the canonical *Jackson v. Virginia*, 443 U.S. 307, 318–21 (1979) (issue in federal habeas review was not whether "any evidence" supported the state conviction

but whether evidence could support finding of guilt beyond a reasonable doubt).

The actual innocence standard for excusing procedural default also puts proof beyond a reasonable doubt front and center, but with one important difference. The issue here is not what a reasonable juror "could do," as in *Jackson*, but what a reasonable juror "would do" when applying the reasonable doubt test. The Supreme Court has rephrased the applicable standard ("to remove the double negative") as requiring new evidence making it "more likely than not [that] any reasonable juror *would* have reasonable doubt." *House v. Bell*, 547 U.S. 518, 538 (2006) (emphasis added); accord, *Schlup*, 513 U.S. at 327. As I read this record, including Ms. Wallace's testimony credited by the state court, there is *some* evidence to support a finding of guilt, but, as required by *House* and *Schlup*, any reasonable juror would have a reasonable doubt once Ms. Wallace's testimony is added to the mix.[1]

As the majority opinion presents the facts, Wilson's trial for the fatal shooting of Melvin Williams presented testimony from four eyewitnesses who identified Wilson as the shooter. From that premise, the majority opinion relies on a portion of our decision in *Blackmon* where we held that new exculpatory testimony from two eyewitnesses was not enough to overcome procedural default. 823 F.3d at 1102. The key to that portion of *Blackmon* was that Blackmon had been identified as one

---

[1] The amendments to the majority opinion have changed several claims about what jurors "could" think in light of the new evidence to what they "would" think. Those changes do not adequately come to grips with the likelihood of a reasonable person reaching such conclusions or jurors' obligation to demand proof beyond a reasonable doubt.

of two killers independently, and consistently, by two utterly neutral witnesses. *Id*. at 1101–02.[2]

Unlike the *Blackmon* case, Wilson has also offered new evidence that not only exonerates him but identifies a different shooter, the state's chief witness. In applying the *Schlup* standard, which may be met by "trustworthy eyewitness accounts," keep in mind that the state judge who heard Ms. Wallace testify, subject to lengthy cross-examination, credited her testimony.

Plus, the original trial testimony here was far shakier than in *Blackmon*. *No witness consistently identified Wilson as the shooter.* The majority opinion leaves out the important fact that the two government witnesses who identified Wilson at trial, King and Smith-Currin, spoke to police on the night of the shooting. Both knew Wilson at the time. Yet neither claimed that night that they had even seen Wilson on the scene, let alone doing the shooting.[3]

That night, Shakira King told police that she had heard another woman claiming Wilson was the shooter. By the time of

---

[2] We remanded *Blackmon* for an evidentiary hearing on other grounds, namely his claim that counsel was ineffective in failing to investigate adequately his alibi defense. 823 F.3d at 1104–07. After remand, Mr. Blackmon won habeas relief on that basis. *Blackmon v. Pfister*, 2018 WL 741390 (N.D. Ill. Feb. 7, 2018).

[3] The fact that both witnesses knew Wilson prior to the shooting is important. The majority opinion states correctly that King and Smith-Currin later identified Wilson as the gunman out of photo lineups, and the majority opinion treats this procedure as adding credibility to the identifications. The weight of those later lineups is undermined by the facts that both already knew him and that neither identified Wilson as the shooter when first interviewed by police.

trial, however, King's story had changed. She testified that she herself saw Wilson shooting, and she denied having told an officer on the night of the shooting that it was her friend who claimed to have recognized the shooter as Wilson. King's trial testimony also contradicted her first description of the shooter's hairstyle. Her description of the shooter's clothing did not match that given by any other witness. And at trial King denied having been part of the fight that preceded the shooting, though she had previously admitted involvement to police and other witnesses had confirmed her part in the melee.

Moving to Smith-Currin, he did not tell police that he saw Wilson shooting until a *month* after the crime. On the night of the shooting, Smith-Currin spoke with police but did not mention Wilson. Smith-Currin's trial testimony describing what he saw the shooter wearing was inconsistent. And at a preliminary hearing, Smith-Currin even testified that some people claimed they had seen him shooting from the duplex's porch.

The two other witnesses who the state argued had previously identified Wilson as the shooter strongly refuted or recanted such statements at trial. Sanntanna Ross told the jury that what police construed as her identifying Wilson as the shooter was simply her indicating that she knew Wilson. When asked on the stand whether she saw Wilson shooting, Ross unequivocally said no. Samantha Coats told the jury that her prior identification of Wilson as the shooter was based only on rumors. When Coats was pressed for an identification by police during the investigation, she said, her boyfriend was in custody and she had been threatened with arrest herself. She chose Wilson (whom she knew and recognized) in a

photo lineup to avoid arrest and in the hope that the police would release her boyfriend.

Only by failing to grapple with these details can the majority opinion describe the testimony implicating Wilson as "matching testimony … delivered at trial and without qualification … ." Ante at 21.

If a jury heard all the trial evidence and Ms. Wallace's testimony, there would of course still be the trial testimony of Smith-Currin and King identifying Wilson as the shooter. That's "some evidence"—but that low bar was the standard rejected even in *Jackson*. Given the problems with their testimony—including their delayed identifications of a person they knew as the shooter they claimed to have seen that night—the lack of any other evidence placing Wilson at the scene, and the consistent and credible testimony of Ms. Wallace, a conscientious juror could not and would not reasonably find Wilson guilty beyond a reasonable doubt.

The majority nevertheless insists that "even with Wallace's testimony, we are left with a series of competing eyewitness accounts, the balance of which would strongly point to Wilson's guilt for reasonable jurors." Ante at 22. With respect, that description of the "balance" of the prosecution's case overlooks three critical points: (1) no witness consistently identified Wilson as the shooter; (2) the prosecution witnesses gave widely varying descriptions of the shooter; and (3) no physical evidence pointed to Wilson as the shooter. When we add Ms. Wallace's credible (as the state court found) and consistent account in which Smith-Currin was the shooter and had a motive to blame Wilson, conscientious jurors would have to doubt whether Wilson was guilty.

The majority opinion also suggests that Ms. Wallace's testimony does not necessarily exculpate Wilson because there might have been more than one shooter. Ante at 22. Perhaps both Smith-Currin and Wilson, and even others, were armed and fired shots? The principal problem with this possibility is that it would make it even harder to convince a jury beyond a reasonable doubt that Wilson was the one who shot the victims. The state prosecuted Wilson on the theory that there was one shooter and that he was the one. The new, more complex, and untested theory of multiple shooters invites speculation. It does not offer a solid basis for denying relief.

The test for actual innocence is demanding, and cases of proven actual innocence are relatively rare. In my view, this is one of those rare cases. I am not saying that Wilson is entitled to a new trial based on his as-yet-unproven claims of ineffective assistance of counsel. But I believe he is entitled to a hearing to try to prove them. I respectfully dissent.